# TILL ET UX. *v.* SCS CREDIT CORP.

No. 02–1016.   Argued December 2, 2003—Decided May 17, 2004

466

*Rebecca J. Harper* argued the cause for petitioners. With her on the briefs was *Annette F. Rush.*

*David B. Salmons* argued the cause *pro hac vice* for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Olson, Assistant Attorney General Keisler, Deputy Solicitor General Clement, Robert M. Loeb*, and *Anthony A. Yang.*

*G. Eric Brunstad, Jr.*, argued the cause for respondent. With him on the brief were *John M. Smith* and *Roger P. Ralph.**

JUSTICE STEVENS announced the judgment of the Court and delivered an opinion, in which JUSTICE SOUTER, JUSTICE GINSBURG, and JUSTICE BREYER join.

To qualify for court approval under Chapter 13 of the Bankruptcy Code, an individual debtor's proposed debt adjustment plan must accommodate each allowed, secured creditor in one of three ways: (1) by obtaining the creditor's acceptance of the plan; (2) by surrendering the property securing the claim; or (3) by providing the creditor both a lien securing the claim and a promise of future property distributions (such as deferred cash payments) whose total "value, as of the effective date of the plan, . . . is not less than the allowed amount of such claim."[1] The third alternative is

---

*Briefs of *amici curiae* urging reversal were filed for the AARP by *Brady C. Williamson, Elizabeth Warren, Jean Constantine-Davis, Nina F. Simon*, and *Michael R. Schuster;* for the National Association of Chapter Thirteen Trustees by *Henry E. Hildebrand III;* and for the National Association of Consumer Bankruptcy Attorneys et al. by *James Justin Haller.*

*James C. Schroeder* filed a brief for Allstate Life Insurance Co. et al. as *amici curiae* urging affirmance.

[1] 11 U. S. C. § 1325(a)(5). The text of the statute reads as follows:

"§ 1325. Confirmation of plan

"(a) Except as provided in subsection (b), the court shall confirm a plan if—

   .        .        .        .        .

"(5) with respect to each allowed secured claim provided for by the plan—

"(A) the holder of such claim has accepted the plan;

commonly known as the "cramdown option" because it may be enforced over a claim holder's objection.[2] *Associates Commercial Corp.* v. *Rash*, 520 U. S. 953, 957 (1997).

Plans that invoke the cramdown power often provide for installment payments over a period of years rather than a single payment.[3]  In such circumstances, the amount of each installment must be calibrated to ensure that, over time, the creditor receives disbursements whose total present value[4] equals or exceeds that of the allowed claim.  The proceedings in this case that led to our grant of certiorari identified four different methods of determining the appropriate method with which to perform that calibration.  Indeed, the Bankruptcy Judge, the District Court, the Court of Appeals majority, and the dissenting judge each endorsed a different approach.  We detail the underlying facts and describe each of those approaches before setting forth our judgment as to which approach best meets the purposes of the Bankruptcy Code.

## I

On October 2, 1998, petitioners Lee and Amy Till, residents of Kokomo, Indiana, purchased a used truck from Instant Auto Finance for $6,395 plus $330.75 in fees and taxes.

---

"(B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and

"(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or

"(C) the debtor surrenders the property securing such claim to such holder . . . ."

[2] As we noted in *Associates Commercial Corp.* v. *Rash*, 520 U. S. 953, 962 (1997), a debtor may also avail himself of the second option (surrender of the collateral) despite the creditor's objection.

[3] See *Rake* v. *Wade*, 508 U. S. 464, 472, n. 8 (1993) (noting that property distributions under § 1325(a)(5)(B)(ii) may take the form of "a stream of future payments").

[4] In the remainder of the opinion, we use the term "present value" to refer to the value as of the effective date of the bankruptcy plan.

They made a $300 downpayment and financed the balance of the purchase price by entering into a retail installment contract that Instant Auto immediately assigned to respondent, SCS Credit Corporation. Petitioners' initial indebtedness amounted to $8,285.24—the $6,425.75 balance of the truck purchase plus a finance charge of 21% per year for 136 weeks, or $1,859.49. Under the contract, petitioners agreed to make 68 biweekly payments to cover this debt; Instant Auto—and subsequently respondent—retained a purchase money security interest that gave it the right to repossess the truck if petitioners defaulted under the contract.

On October 25, 1999, petitioners, by then in default on their payments to respondent, filed a joint petition for relief under Chapter 13 of the Bankruptcy Code. At the time of the filing, respondent's outstanding claim amounted to $4,894.89, but the parties agreed that the truck securing the claim was worth only $4,000. App. 16–17. In accordance with the Bankruptcy Code, therefore, respondent's secured claim was limited to $4,000, and the $894.89 balance was unsecured.[5] Petitioners' filing automatically stayed debt-collection activity by their various creditors, including the Internal Revenue Service (IRS), respondent, three other holders of secured claims, and unidentified unsecured creditors. In addition, the filing created a bankruptcy estate, administered by a trustee, which consisted of petitioners' property, including the truck.[6]

---

[5] Title 11 U. S. C. § 506(a) provides:

"An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, . . . and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest."

[6] See §§ 541(a), 1306(a).

Petitioners' proposed debt adjustment plan called for them to submit their future earnings to the supervision and control of the Bankruptcy Court for three years, and to assign $740 of their wages to the trustee each month.[7]  App. to Pet. for Cert. 76a–81a.  The plan charged the trustee with distributing these monthly wage assignments to pay, in order of priority: (1) administrative costs; (2) the IRS's priority tax claim; (3) secured creditors' claims; and finally, (4) unsecured creditors' claims.  *Id.*, at 77a–79a.

The proposed plan also provided that petitioners would pay interest on the secured portion of respondent's claim at a rate of 9.5% per year.  Petitioners arrived at this "prime-plus" or "formula rate" by augmenting the national prime rate of approximately 8% (applied by banks when making low-risk loans) to account for the risk of nonpayment posed by borrowers in their financial position.  Respondent objected to the proposed rate, contending that the company was "entitled to interest at the rate of 21%, which is the rate . . . it would obtain if it could foreclose on the vehicle and reinvest the proceeds in loans of equivalent duration and risk as the loan" originally made to petitioners.  App. 19–20.

At the hearing on its objection, respondent presented expert testimony establishing that it uniformly charges 21% interest on so-called "subprime" loans, or loans to borrowers with poor credit ratings, and that other lenders in the subprime market also charge that rate.  Petitioners countered with the testimony of an Indiana University-Purdue University Indianapolis economics professor, who acknowledged that he had only limited familiarity with the subprime auto lending market, but described the 9.5% formula rate as "very reasonable" given that Chapter 13 plans are "supposed to be

---

[7] Petitioners submitted an initial plan that would have required them to assign $1,089 of their wages to the trustee every month.  App. 9.  Their amended plan, however, reduced this monthly payment to $740.  App. to Pet. for Cert. 77a.

financially feasible."[8]   *Id.*, at 43–44.   Moreover, the professor noted that respondent's exposure was "fairly limited because [petitioners] are under the supervision of the court." *Id.*, at 43.   The bankruptcy trustee also filed comments supporting the formula rate as, among other things, easily ascertainable, closely tied to the "condition of the financial market," and independent of the financial circumstances of any particular lender.   App. to Pet. for Cert. 41a–42a.   Accepting petitioners' evidence, the Bankruptcy Court overruled respondent's objection and confirmed the proposed plan.

The District Court reversed.   It understood Seventh Circuit precedent to require that bankruptcy courts set cramdown interest rates at the level the creditor could have obtained if it had foreclosed on the loan, sold the collateral, and reinvested the proceeds in loans of equivalent duration and risk.   Citing respondent's unrebutted testimony about the market for subprime loans, the court concluded that 21% was the appropriate rate.   *Id.*, at 38a.

On appeal, the Seventh Circuit endorsed a slightly modified version of the District Court's "coerced" or "forced loan" approach.   *In re Till*, 301 F. 3d 583, 591 (2002).   Specifically, the majority agreed with the District Court that, in a cramdown proceeding, the inquiry should focus on the interest rate "that the creditor in question would obtain in making a new loan in the same industry to a debtor who is similarly situated, although not in bankruptcy."   *Id.*, at 592.   To approximate that new loan rate, the majority looked to the parties' prebankruptcy contract rate (21%).   The court recognized, however, that using the contract rate would not "duplicat[e] precisely . . . the present value of the collateral to the creditor" because loans to bankrupt, court-supervised debtors "involve some risks that would not be incurred in a

---

[8] The requirement of financial feasibility derives from 11 U. S. C. § 1325(a)(6), which provides that the bankruptcy court shall "confirm a plan if . . . the debtor will be able to make all payments under the plan and to comply with the plan."   See *infra*, at 480.

new loan to a debtor not in default" and also produce "some economies." *Ibid.* To correct for these inaccuracies, the majority held that the original contract rate should "serve as a presumptive [cramdown] rate," which either the creditor or the debtor could challenge with evidence that a higher or lower rate should apply. *Ibid.* Accordingly, the court remanded the case to the Bankruptcy Court to afford petitioners and respondent an opportunity to rebut the presumptive 21% rate.[9]

Dissenting, Judge Rovner argued that the majority's presumptive contract rate approach overcompensates secured creditors because it fails to account for costs a creditor would have to incur in issuing a new loan. Rather than focusing on the market for comparable loans, Judge Rovner advocated the Bankruptcy Court's formula approach. *Id.*, at 596. Although Judge Rovner noted that the rates produced by either the formula or the cost of funds approach might be "piddling" relative to the coerced loan rate, she suggested courts should "consider the extent to which the creditor has already been compensated for . . . the risk that the debtor will be unable to discharge his obligations under the reorganization plan . . . in the rate of interest that it charged to the debtor in return for the original loan." *Ibid.* We granted certiorari and now reverse. 539 U. S. 925 (2003).

## II

The Bankruptcy Code provides little guidance as to which of the rates of interest advocated by the four opinions in this case—the formula rate, the coerced loan rate, the presumptive contract rate, or the cost of funds rate—Congress had in mind when it adopted the cramdown provision. That provision, 11 U. S. C. § 1325(a)(5)(B), does not mention the term "discount rate" or the word "interest." Rather, it simply

---

[9] As 21% is the maximum interest rate creditors may charge for consumer loans under Indiana's usury statute, Ind. Code § 24–4.5–3–201 (1993), the remand presumably could not have benefited respondent.

requires bankruptcy courts to ensure that the property to be distributed to a particular secured creditor over the life of a bankruptcy plan has a total "value, as of the effective date of the plan," that equals or exceeds the value of the creditor's allowed secured claim—in this case, $4,000. § 1325(a)(5)(B)(ii).

That command is easily satisfied when the plan provides for a lump-sum payment to the creditor. Matters are not so simple, however, when the debt is to be discharged by a series of payments over time. A debtor's promise of future payments is worth less than an immediate payment of the same total amount because the creditor cannot use the money right away, inflation may cause the value of the dollar to decline before the debtor pays, and there is always some risk of nonpayment. The challenge for bankruptcy courts reviewing such repayment schemes, therefore, is to choose an interest rate sufficient to compensate the creditor for these concerns.

Three important considerations govern that choice. First, the Bankruptcy Code includes numerous provisions that, like the cramdown provision, require a court to "discoun[t] . . . [a] stream of deferred payments back to the[ir] present dollar value," *Rake* v. *Wade*, 508 U. S. 464, 472, n. 8 (1993), to ensure that a creditor receives at least the value of its claim.[10] We think it likely that Congress intended bankruptcy judges and trustees to follow essentially the same approach when choosing an appropriate interest rate under any of these provisions. Moreover, we think Congress would favor an approach that is familiar in the financial

---

[10] See 11 U. S. C. § 1129(a)(7)(A)(ii) (requiring payment of property whose "value, as of the effective date of the plan" equals or exceeds the value of the creditor's claim); §§ 1129(a)(7)(B), 1129(a)(9)(B)(i), 1129(a)(9)(C), 1129(b)(2)(A)(i)(II), 1129(b)(2)(B)(i), 1129(b)(2)(C)(i), 1173(a)(2), 1225(a)(4), 1225(a)(5)(B)(ii), 1228(b)(2), 1325(a)(4), 1228(b)(2) (same).

community and that minimizes the need for expensive evidentiary proceedings.

Second, Chapter 13 expressly authorizes a bankruptcy court to modify the rights of any creditor whose claim is secured by an interest in anything other than "real property that is the debtor's principal residence." 11 U. S. C. § 1322(b)(2).[11] Thus, in cases like this involving secured interests in personal property, the court's authority to modify the number, timing, or amount of the installment payments from those set forth in the debtor's original contract is perfectly clear. Further, the potential need to modify the loan terms to account for intervening changes in circumstances is also clear: On the one hand, the fact of the bankruptcy establishes that the debtor is overextended and thus poses a significant risk of default; on the other hand, the postbankruptcy obligor is no longer the individual debtor but the court-supervised estate, and the risk of default is thus somewhat reduced.[12]

---

[11] Section 1322(b)(2) provides:

"[T]he plan may . . . modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, . . . or leave unaffected the rights of holders of any class of claims."

[12] Several factors contribute to this reduction in risk. First, as noted below, *infra*, at 480, a court may only approve a cramdown loan (and the debt adjustment plan of which the loan is a part) if it believes the debtor will be able to make all of the required payments. § 1325(a)(6). Thus, such loans will only be approved for debtors that the court deems creditworthy. Second, Chapter 13 plans must "provide for the submission" to the trustee "of all or such portion of [the debtor's] future . . . income . . . as is necessary for the execution of the plan," § 1322(a)(1), so the possibility of nonpayment is greatly reduced. Third, the Bankruptcy Code's extensive disclosure requirements reduce the risk that the debtor has significant undisclosed obligations. Fourth, as a practical matter, the public nature of the bankruptcy proceeding is likely to reduce the debtor's opportunities to take on additional debt. Cf. 11 U. S. C. § 525 (prohibiting certain Government grant and loan programs from discriminating against applicants who are or have been bankrupt).

Third, from the point of view of a creditor, the cramdown provision mandates an objective rather than a subjective inquiry.[13] That is, although § 1325(a)(5)(B) entitles the creditor to property whose present value objectively equals or exceeds the value of the collateral, it does not require that the terms of the cramdown loan match the terms to which the debtor and creditor agreed prebankruptcy, nor does it require that the cramdown terms make the creditor subjectively indifferent between present foreclosure and future payment. Indeed, the very idea of a "cramdown" loan *precludes* the latter result: By definition, a creditor forced to accept such a loan would prefer instead to foreclose.[14] Thus, a court choosing a cramdown interest rate need not consider the creditor's individual circumstances, such as its prebankruptcy dealings with the debtor or the alternative loans it

[13] We reached a similar conclusion in *Associates Commercial Corp.* v. *Rash,* 520 U. S. 953 (1997), when we held that a creditor's secured interest should be valued from the debtor's, rather than the creditor's, perspective. *Id.,* at 963 ("[The debtor's] actual use, rather than a foreclosure sale that will not take place, is the proper guide . . .").

[14] This fact helps to explain why there is no readily apparent Chapter 13 "cramdown market rate of interest": Because every cramdown loan is imposed by a court over the objection of the secured creditor, there is no free market of willing cramdown lenders. Interestingly, the same is *not* true in the Chapter 11 context, as numerous lenders advertise financing for Chapter 11 debtors in possession. See, *e. g.,* Balmoral Financial Corporation, http://www.balmoral.com/bdip.htm (all Internet materials as visited Mar. 4, 2004, and available in Clerk of Court's case file) (advertising debtor in possession lending); Debtor in Possession Financing: 1st National Assistance Finance Association DIP Division, http://www.loanmallusa.com/dip.htm (offering "to tailor a financing program . . . to your business' needs and . . . to work closely with your bankruptcy counsel"). Thus, when picking a cramdown rate in a Chapter 11 case, it might make sense to ask what rate an efficient market would produce. In the Chapter 13 context, by contrast, the absence of any such market obligates courts to look to first principles and ask only what rate will fairly compensate a creditor for its exposure.

could make if permitted to foreclose.[15]   Rather, the court should aim to treat similarly situated creditors similarly,[16] and to ensure that an objective economic analysis would suggest the debtor's interest payments will adequately compensate all such creditors for the time value of their money and the risk of default.

## III

These considerations lead us to reject the coerced loan, presumptive contract rate, and cost of funds approaches. Each of these approaches is complicated, imposes significant evidentiary costs, and aims to make each individual creditor whole rather than to ensure the debtor's payments have the required present value.   For example, the coerced loan approach requires bankruptcy courts to consider evidence about the market for comparable loans to similar (though nonbankrupt) debtors—an inquiry far removed from such courts' usual task of evaluating debtors' financial circumstances and the feasibility of their debt adjustment plans. In addition, the approach overcompensates creditors because the market lending rate must be high enough to cover factors, like lenders' transaction costs and overall profits, that are no longer relevant in the context of court-administered and court-supervised cramdown loans.

Like the coerced loan approach, the presumptive contract rate approach improperly focuses on the creditor's potential use of the proceeds of a foreclosure sale.   In addition, although the approach permits a debtor to introduce some evidence about each creditor, thereby enabling the court to tailor the interest rate more closely to the creditor's financial circumstances and reducing the likelihood that the creditor

[15] See *supra*, at 472 (noting that the District Court's coerced loan approach aims to set the cramdown interest rate at the level the creditor could obtain from new loans of comparable duration and risk).

[16] Cf. 11 U. S. C. § 1322(a)(3) ("The plan shall . . . provide the same treatment for each claim within a particular class").

will be substantially overcompensated, that right comes at a cost: The debtor must obtain information about the creditor's costs of overhead, financial circumstances, and lending practices to rebut the presumptive contract rate. Also, the approach produces absurd results, entitling "inefficient, poorly managed lenders" with lower profit margins to obtain higher cramdown rates than "well managed, better capitalized lenders." 2 K. Lundin, Chapter 13 Bankruptcy § 112.1, p. 112–8 (3d ed. 2000). Finally, because the approach relies heavily on a creditor's prior dealings with the debtor, similarly situated creditors may end up with vastly different cramdown rates.[17]

The cost of funds approach, too, is improperly aimed. Although it rightly disregards the now-irrelevant terms of the parties' original contract, it mistakenly focuses on the creditworthiness of the *creditor* rather than the debtor. In addition, the approach has many of the other flaws of the coerced loan and presumptive contract rate approaches. For example, like the presumptive contract rate approach, the cost of funds approach imposes a significant evidentiary burden, as a debtor seeking to rebut a creditor's asserted cost of borrowing must introduce expert testimony about the creditor's financial condition. Also, under this approach, a creditworthy lender with a low cost of borrowing may obtain a lower cramdown rate than a financially unsound, fly-by-night lender.

## IV

The formula approach has none of these defects. Taking its cue from ordinary lending practices, the approach begins

---

[17] For example, suppose a debtor purchases two identical used cars, buying the first at a low purchase price from a lender who charges high interest, and buying the second at a much higher purchase price from a lender who charges zero-percent or nominal interest. Prebankruptcy, these two loans might well produce identical income streams for the two lenders. Postbankruptcy, however, the presumptive contract rate approach would entitle the first lender to a considerably higher cramdown interest rate, even though the two secured debts are objectively indistinguishable.

by looking to the national prime rate, reported daily in the press, which reflects the financial market's estimate of the amount a commercial bank should charge a creditworthy commercial borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default.[18] Because bankrupt debtors typically pose a greater risk of nonpayment than solvent commercial borrowers, the approach then requires a bankruptcy court to adjust the prime rate accordingly. The appropriate size of that risk adjustment depends, of course, on such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan. The court must therefore hold a hearing at which the debtor and any creditors may present evidence about the appropriate risk adjustment. Some of this evidence will be included in the debtor's bankruptcy filings, however, so the debtor and creditors may not incur significant additional expense. Moreover, starting from a concededly *low* estimate and adjusting *upward* places the evidentiary burden squarely on the creditors, who are likely to have readier access to any information absent from the debtor's filing (such as evidence about the "liquidity of the collateral market," *post*, at 499 (SCALIA, J., dissenting)). Finally, many of the factors relevant to the adjustment fall squarely within the bankruptcy court's area of expertise.

Thus, unlike the coerced loan, presumptive contract rate, and cost of funds approaches, the formula approach entails a straightforward, familiar, and objective inquiry, and minimizes the need for potentially costly additional evidentiary proceedings. Moreover, the resulting "prime-plus" rate of interest depends only on the state of financial markets, the circumstances of the bankruptcy estate, and the characteristics of the loan, not on the creditor's circumstances or its prior interactions with the debtor. For these reasons, the

---

[18] We note that, if the court could somehow be certain a debtor would complete his plan, the prime rate would be adequate to compensate any secured creditors forced to accept cramdown loans.

prime-plus or formula rate best comports with the purposes of the Bankruptcy Code.[19]

We do not decide the proper scale for the risk adjustment, as the issue is not before us. The Bankruptcy Court in this case approved a risk adjustment of 1.5%, App. to Pet. for Cert. 44a–73a, and other courts have generally approved adjustments of 1% to 3%, see *In re Valenti*, 105 F. 3d 55, 64 (CA2) (collecting cases), abrogated on other grounds by *Associates Commercial Corp.* v. *Rash*, 520 U. S. 953 (1997). Respondent's core argument is that a risk adjustment in this range is entirely inadequate to compensate a creditor for the real risk that the plan will fail. There is some dispute about the true scale of that risk—respondent claims that more than 60% of Chapter 13 plans fail, Brief for Respondent 25, but petitioners argue that the failure rate for *approved* Chapter 13 plans is much lower, Tr. of Oral Arg. 9. We need not resolve that dispute. It is sufficient for our purposes to note that, under 11 U. S. C. § 1325(a)(6), a court may not approve a plan unless, after considering all creditors' objections and receiving the advice of the trustee, the judge is persuaded that "the debtor will be able to make all payments under the plan and to comply with the plan." *Ibid.* Together with the cramdown provision, this requirement obligates the court to select a rate high enough to compensate the creditor for its risk but not so high as to doom the plan. If the court determines that the likelihood of default is so high as to ne-

---

[19] The fact that Congress considered but rejected legislation that would endorse the Seventh Circuit's presumptive contract rate approach, H. R. 1085, 98th Cong., 1st Sess., § 19(2)(A) (1983); H. R. 1169, 98th Cong., 1st Sess., § 19(2)(A) (1983); H. R. 4786, 97th Cong., 1st Sess., § 19(2)(A) (1981), lends some support to our conclusion. It is perhaps also relevant that our conclusion is endorsed by the Executive Branch of the Government and by the National Association of Chapter Thirteen Trustees. Brief for United States as *Amicus Curiae;* Brief for National Association of Chapter Thirteen Trustees as *Amicus Curiae.* If we have misinterpreted Congress' intended meaning of "value, as of the date of the plan," we are confident it will enact appropriate remedial legislation.

cessitate an "eye-popping" interest rate, 301 F. 3d, at 593 (Rovner, J., dissenting), the plan probably should not be confirmed.

V

The dissent's endorsement of the presumptive contract rate approach rests on two assumptions: (1) "subprime lending markets are competitive and therefore largely efficient"; and (2) the risk of default in Chapter 13 is normally no less than the risk of default at the time of the original loan. *Post,* at 492–493. Although the Bankruptcy Code provides little guidance on the question, we think it highly unlikely that Congress would endorse either premise.

First, the dissent assumes that subprime loans are negotiated between fully informed buyers and sellers in a classic free market. But there is no basis for concluding that Congress relied on this assumption when it enacted Chapter 13. Moreover, several considerations suggest that the subprime market is not, in fact, perfectly competitive. To begin with, used vehicles are regularly sold by means of tie-in transactions, in which the price of the vehicle is the subject of negotiation, while the terms of the financing are dictated by the seller.[20] In addition, there is extensive fed-

---

[20] The dissent notes that "[t]ie-ins do not *alone* make financing markets noncompetitive; they only cause prices and interest rates to be considered *in tandem* rather than separately." *Post,* at 495. This statement, while true, is nonresponsive. If a market prices the cost of goods and the cost of financing together, then even if that market is perfectly competitive, all we can know is that the *combined* price of the goods and the financing is competitive and efficient. We have no way of determining whether the allocation of that price between goods and financing would be the same if the two components were separately negotiated. But the only issue before us is the cramdown interest rate (the cost of financing); the value of respondent's truck (the cost of the goods) is fixed. See *Rash,* 520 U. S., at 960 (setting the value of collateral in Chapter 13 proceedings at the "price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller"). The competitiveness of the market for cost-*cum*-financing is thus irrelevant to our analysis.

eral[21] and state[22] regulation of subprime lending, which not only itself distorts the market, but also evinces regulators' belief that unregulated subprime lenders would exploit borrowers' ignorance and charge rates above what a competitive market would allow.[23]  Indeed, Congress enacted the Truth in Lending Act in part because it believed "consumers would individually benefit not only from the more informed use of credit, but also from heightened competition which would result from more knowledgeable credit shopping." S. Rep. No. 96–368, p. 16 (1979).[24]

Second, the dissent apparently believes that the debtor's prebankruptcy default—on a loan made in a market in which creditors commonly charge the maximum rate of interest allowed by law, Brief for Respondent 16, and in which neither creditors nor debtors have the protections afforded by Chapter 13—translates into a high probability that the same debtor's confirmed Chapter 13 plan will fail.  In our view, however, Congress intended to create a program under which plans that qualify for confirmation have a high probability of success.  Perhaps bankruptcy judges currently confirm too

---

[21] For example, the Truth in Lending Act regulates credit transactions and credit advertising.  15 U. S. C. §§ 1604–1649, 1661–1665b.

[22] Usury laws provide the most obvious examples of state regulation of the subprime market.  See, e. g., Colo. Rev. Stat. § 5–2–201 (2003); Fla. Stat. Ann. § 537.011 (Supp. 2004); Ind. Code § 24–4.5–3–201 (1993); Md. Com. Law Code Ann. § 12–404(d) (2000).

[23] Lending practices in Mississippi, "where there currently is no legal usury rate," support this conclusion: In that State, subprime lenders charge rates "as high as 30 to 40%"—well above the rates that apparently suffice to support the industry in States like Indiana.  Norberg, Consumer Bankruptcy's New Clothes: An Empirical Study of Discharge and Debt Collection in Chapter 13, 7 Am. Bankr. Inst. L. Rev. 415, 438–439 (1999).

[24] See also H. R. Rep. No. 1040, 90th Cong., 1st Sess., 17 (1967) ("The basic premise of the application of disclosure standards to credit advertising rests in the belief that a substantial portion of consumer purchases are induced by such advertising and that if full disclosure is not made in such advertising, the consumer will be deprived of the opportunity to effectively comparison shop for credit").

many risky plans, but the solution is to confirm fewer such plans, not to set default cramdown rates at absurdly high levels, thereby increasing the risk of default.

Indeed, as JUSTICE THOMAS demonstrates, *post*, at 487 (opinion concurring in judgment), the text of § 1325(a)(5)(B)(ii) may be read to support the conclusion that Congress did not intend the cramdown rate to include *any* compensation for the risk of default.[25] That reading is consistent with a view that Congress believed Chapter 13's protections to be so effective as to make the risk of default negligible. Because our decision in *Rash* assumes that cramdown interest rates are adjusted to "offset," to the extent possible, the risk of default, 520 U. S., at 962–963, and because so many judges who have considered the issue (including the authors of the four earlier opinions in this case) have rejected the risk-free approach, we think it too late in the day to endorse that approach now. Of course, if the text of the statute required such an approach, that would be the end of the matter. We think, however, that § 1325(a)(5)(B)(ii)'s reference to "value, as of the effective date of the plan, of property to be distributed under the plan" is better read to incorporate all of the commonly understood components of "present value," including any risk of nonpayment. JUSTICE THOMAS' reading does emphasize, though, that a presumption that bankruptcy plans will succeed is more consistent with Congress' statutory scheme than the dissent's more cynical focus on bankrupt debtors' "financial instability and . . . proclivity to seek legal protection," *post*, at 493.

Furthermore, the dissent's two assumptions do not necessarily favor the presumptive contract rate approach. For one thing, the cramdown provision applies not only to sub-

---

[25] The United States, too, notes that "[t]he text of Section 1325 is consistent with the view that the appropriate discount rate should reflect only the time value of money and not any risk premium." Brief for United States as *Amicus Curiae* 11, n. 4. The remainder of the United States' brief, however, advocates the formula approach. See, *e. g., id.,* at 19–28.

prime loans but also to prime loans negotiated prior to the change in circumstance (job loss, for example) that rendered the debtor insolvent. Relatedly, the provision also applies in instances in which national or local economic conditions drastically improved or declined after the original loan was issued but before the debtor filed for bankruptcy. In either case, there is every reason to think that a properly risk-adjusted prime rate will provide a better estimate of the creditor's current costs and exposure than a contract rate set in different times.

Even more important, if all relevant information about the debtor's circumstances, the creditor's circumstances, the nature of the collateral, and the market for comparable loans were equally available to both debtor and creditor, then in theory the formula and presumptive contract rate approaches would yield the same final interest rate. Thus, we principally differ with the dissent not over what final rate courts should adopt but over which party (creditor or debtor) should bear the burden of rebutting the presumptive rate (prime or contract, respectively).

JUSTICE SCALIA identifies four "relevant factors bearing on risk premium[:] (1) the probability of plan failure; (2) the rate of collateral depreciation; (3) the liquidity of the collateral market; and (4) the administrative expenses of enforcement." *Post*, at 499. In our view, any information debtors have about any of these factors is likely to be included in their bankruptcy filings, while the remaining information will be far more accessible to creditors (who must collect information about their lending markets to remain competitive) than to individual debtors (whose only experience with those markets might be the single loan at issue in the case). Thus, the formula approach, which begins with a concededly low estimate of the appropriate interest rate and requires the creditor to present evidence supporting a higher rate, places the evidentiary burden on the more knowledgeable

party, thereby facilitating more accurate calculation of the appropriate interest rate.

If the rather sketchy data uncovered by the dissent support an argument that Chapter 13 of the Bankruptcy Code should mandate application of the presumptive contract rate approach (rather than merely an argument that bankruptcy judges should exercise greater caution before approving debt adjustment plans), those data should be forwarded to Congress. We are not persuaded, however, that the data undermine our interpretation of the statutory scheme Congress has enacted.

The judgment of the Court of Appeals is reversed, and the case is remanded with instructions to remand the case to the Bankruptcy Court for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE THOMAS, concurring in the judgment.

This case presents the issue of what the proper method is for discounting deferred payments to present value and what compensation the creditor is entitled to in calculating the appropriate discount rate of interest. Both the plurality and the dissent agree that "[a] debtor's promise of future payments is worth less than an immediate payment of the same total amount because the creditor cannot use the money right away, inflation may cause the value of the dollar to decline before the debtor pays, and there is always some risk of nonpayment." *Ante,* at 474; *post,* at 491. Thus, the plurality and the dissent agree that the proper method for discounting deferred payments to present value should take into account each of these factors, but disagree over the proper starting point for calculating the risk of nonpayment.

I agree that a *"promise* of future payments is worth less than an immediate payment" of the same amount, in part because of the risk of nonpayment. But this fact is irrelevant. The statute does not require that the value of the

*promise* to distribute property under the plan be no less than the allowed amount of the secured creditor's claim. It requires only that "the value . . . of *property* to be distributed under the plan," at the time of the effective date of the plan, be no less than the amount of the secured creditor's claim. 11 U. S. C. § 1325(a)(5)(B)(ii) (emphasis added). Both the plurality and the dissent ignore the clear text of the statute in an apparent rush to ensure that secured creditors are not undercompensated in bankruptcy proceedings. But the statute that Congress enacted does not require a debtor-specific risk adjustment that would put secured creditors in the same position as if they had made another loan. It is for this reason that I write separately.

I

"It is well established that 'when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'" *Lamie* v. *United States Trustee,* 540 U. S. 526, 534 (2004) (quoting *Hartford Underwriters Ins. Co.* v. *Union Planters Bank, N. A.,* 530 U. S. 1, 6 (2000)). Section 1325(a)(5)(B) provides that "with respect to each allowed secured claim provided for by the plan," "the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim [must] not [be] less than the allowed amount of such claim." Thus, the statute requires a bankruptcy court to make at least three separate determinations. First, a court must determine the allowed amount of the claim. Second, a court must determine what is the "property to be distributed under the plan." Third, a court must determine the "value, as of the effective date of the plan," of the property to be distributed.

The dispute in this case centers on the proper method to determine the "value, as of the effective date of the plan, of property to be distributed under the plan." The requirement that the "value" of the property to be distributed be

determined "as of the effective date of the plan" incorporates the principle of the time value of money. To put it simply, $4,000 today is worth more than $4,000 to be received 17 months from today because if received today, the $4,000 can be invested to start earning interest immediately.[1] See G. Munn, F. Garcia, & C. Woelfel, Encyclopedia of Banking & Finance 1015 (rev. 9th ed. 1991). Thus, as we explained in *Rake* v. *Wade*, 508 U. S. 464 (1993), "[w]hen a claim is paid off pursuant to a stream of future payments, a creditor receives the 'present value' of its claim only if the total amount of the deferred payments includes the amount of the underlying claim plus an appropriate amount of interest to compensate the creditor for the decreased value of the claim caused by the delayed payments." *Id.*, at 472, n. 8.

Respondent argues, and the plurality and the dissent agree, that the proper interest rate must also reflect the risk of nonpayment. But the statute contains no such requirement. The statute only requires the valuation of the "property to be distributed," not the valuation of the plan (*i. e.*, the promise to make the payments itself). Thus, in order for a plan to satisfy § 1325(a)(5)(B)(ii), the plan need only propose an interest rate that will compensate a creditor for the fact that if he had received the property immediately rather than at a future date, he could have immediately made use of the property. In most, if not all, cases, where the plan proposes simply a stream of cash payments, the appropriate risk-free rate should suffice.

Respondent here would certainly be acutely aware of any risk of default inherent in a Chapter 13 plan, but it is nonsensical to speak of a debtor's risk of default being inherent in the value of "property" unless that property is a promise or

---

[1] For example, if the relevant interest rate is 10%, receiving $4,000 one year from now is the equivalent to receiving $3,636.36 today. In other words, an investor would be indifferent to receiving $3,636.36 today and receiving $4,000 one year from now because each will equal $4,000 one year from now.

a debt. Suppose, for instance, that it is currently time A, the property to be distributed is a house, and it will be distributed at time B. Although market conditions might cause the value of the house to fluctuate between time A and time B, the fluctuating value of the house itself has nothing to do with the risk that the debtor will not deliver the house at time B. The value of the house, then, can be and is determined entirely without any reference to any possibility that a promise to transfer the house would not be honored. So too, then, with cash: the value of the cash can be and is determined without any inclusion of any risk that the debtor will fail to transfer the cash at the appropriate time.

The dissent might be correct that the use of the prime rate,[2] even with a small risk adjustment, "will systematically undercompensate secured creditors for the true risks of default." *Post*, at 492.[3] This systematic undercompensation might seem problematic as a matter of policy. But, it raises no problem as a matter of statutory interpretation. Thus, although there is always some risk of nonpayment when A promises to repay a debt to B through a stream of payments over time rather than through an immediate lump-sum payment, § 1325(a)(5)(B)(ii) does not take this risk into account.

This is not to say that a debtor's risk of nonpayment can never be a factor in determining the value of the property to be distributed. Although "property" is not defined in the Bankruptcy Code, nothing in § 1325 suggests that "property" is limited to cash. Rather, " 'property' can be cash, notes, stock, personal property or real property; in short, anything of value." 7 Collier on Bankruptcy ¶ 1129.03[7][b][i], p. 1129–44 (rev. 15th ed. 2003) (discussing Chapter 11's cramdown provision). And if the "property to be distributed"

---

[2] The prime rate is "[t]he interest rate most closely approximating the riskless or pure rate for money." G. Munn, F. Garcia, & C. Woelfel, Encyclopedia of Banking & Finance 830 (rev. 9th ed. 1991).

[3] Of course, in an efficient market, this risk has been (or will be) built into the interest rate of the original loan.

under a Chapter 13 plan is a note (*i. e.*, a promise to pay), for instance, the value of that note necessarily includes the risk that the debtor will not make good on that promise. Still, accounting for the risk of nonpayment in that case is not equivalent to reading a risk adjustment requirement into the statute, as in the case of a note, the risk of nonpayment is part of the value of the note itself.

Respondent argues that "Congress crafted the requirements of section 1325(a)(5)(B)(ii) for the protection of *creditors*, not debtors," and thus that the relevant interest rate must account for the true risks and costs associated with a Chapter 13 debtor's promise of future payment. Brief for Respondent 24 (citing *Johnson* v. *Home State Bank*, 501 U. S. 78, 87–88 (1991)). In addition to ignoring the plain language of the statute, which requires no such risk adjustment, respondent overlooks the fact that secured creditors are already compensated in part for the risk of nonpayment through the valuation of the secured claim. In *Associates Commercial Corp.* v. *Rash*, 520 U. S. 953 (1997), we utilized a secured-creditor-friendly replacement-value standard rather than the lower foreclosure-value standard for valuing secured claims when a debtor has exercised Chapter 13's cramdown option. We did so because the statute at issue in that case reflected Congress' recognition that "[i]f a debtor keeps the property and continues to use it, the creditor obtains at once neither the property nor its value and is exposed to double risks: The debtor may again default and the property may deteriorate from extended use." *Id.*, at 962.

Further, the plain language of the statute is by no means specifically debtor protective. As the Court pointed out in *Johnson, supra*, at 87–88, § 1325 contains a number of provisions to protect creditors: A bankruptcy court can only authorize a plan that "has been proposed in good faith," § 1325(a)(3); secured creditors must accept the plan, obtain the property securing the claim, or "retain the[ir] lien[s]" and receive under the plan distributions of property which equal

"not less than the allowed amount of such claim," § 1325(a)(5); and a bankruptcy court must ensure that "the debtor will be able to make all payments under the plan and to comply with the plan," § 1325(a)(6). Given the presence of multiple creditor-specific protections, it is by no means irrational to assume that Congress opted not to provide further protection for creditors by requiring a debtor-specific risk adjustment under § 1325(a)(5). Although the dissent may feel that this is insufficient compensation for secured creditors, given the apparent rate at which debtors fail to complete their Chapter 13 plans, see *post*, at 493, and n. 1, this is a matter that should be brought to the attention of Congress rather than resolved by this Court.

## II

The allowed amount of the secured claim is $4,000. App. 57. The statute then requires a bankruptcy court to identify the "property to be distributed" under the plan. Petitioners' Amended Chapter 13 Plan (Plan) provided:

"The future earnings of DEBTOR(S) are submitted to the supervision and control of this Court, and DEBTOR(S) shall pay to the TRUSTEE a sum of $740 . . . per month in weekly installments by voluntary wage assignment by separate ORDER of the Court in an estimated amount of $170.77 and continuing for a total plan term of 36 months unless this Court approves an extension of the term not beyond 60 months from the date of filing the Petition herein." App. to Pet. for Cert. 77a.

From the payments received, the trustee would then make disbursements to petitioners' creditors, pro rata among each class of creditors. The Plan listed one priority claim and four secured claims. For respondent's secured claim, petitioners proposed an interest rate of 9.5%. App. 57. Thus, petitioners proposed to distribute to respondent a stream of cash payments equaling respondent's pro rata share of $740 per month for a period of up to 36 months. *Id.*, at 12.

Although the Plan does not specifically state that "the property to be distributed" under the Plan is cash payments, the cash payments are the only "property" specifically listed for distribution under the Plan.   Thus, although the plurality and the dissent imply that the "property to be distributed" under the Plan is the mere *promise* to make cash payments, the plain language of the Plan indicates that the "property to be distributed" to respondent is up to 36 monthly cash payments, consisting of a pro rata share of $740 per month.

The final task, then, is to determine whether petitioners' proposed 9.5% interest rate will sufficiently compensate respondent for the fact that instead of receiving $4,000 today, it will receive $4,000 plus 9.5% interest over a period of up to 36 months.   Because the 9.5% rate is higher than the risk-free rate, I conclude that it will.   I would therefore reverse the judgment of the Court of Appeals.

JUSTICE SCALIA, with whom THE CHIEF JUSTICE, JUSTICE O'CONNOR, and JUSTICE KENNEDY join, dissenting.

My areas of agreement with the plurality are substantial. We agree that, although all confirmed Chapter 13 plans have been deemed feasible by a bankruptcy judge, some nevertheless fail.   See *ante*, at 480.   We agree that any deferred payments to a secured creditor must fully compensate it for the risk that such a failure will occur.   See *ante*, at 474.   Finally, we agree that adequate compensation may sometimes require an "'eye-popping'" interest rate, and that, if the rate is too high for the plan to succeed, the appropriate course is not to reduce it to a more palatable level, but to refuse to confirm the plan.   See *ante*, at 480–481.

Our only disagreement is over what procedure will more often produce accurate estimates of the appropriate interest rate.   The plurality would use the prime lending rate—a rate we *know* is too low—and require the judge in every case to determine an amount by which to increase it.   I believe

that, in practice, this approach will systematically undercompensate secured creditors for the true risks of default. I would instead adopt the contract rate—*i. e.*, the rate at which the creditor actually loaned funds to the debtor—as a presumption that the bankruptcy judge could revise on motion of either party. Since that rate is generally a good indicator of actual risk, disputes should be infrequent, and it will provide a quick and reasonably accurate standard.

I

The contract-rate approach makes two assumptions, both of which are reasonable. First, it assumes that subprime lending markets are competitive and therefore largely efficient. If so, the high interest rates lenders charge reflect not extortionate profits or excessive costs, but the actual risks of default that subprime borrowers present. Lenders with excessive rates would be undercut by their competitors, and inefficient ones would be priced out of the market. We have implicitly assumed market competitiveness in other bankruptcy contexts. See *Bank of America Nat. Trust and Sav. Assn.* v. *203 North LaSalle Street Partnership*, 526 U. S. 434, 456–458 (1999). Here the assumption is borne out by empirical evidence: One study reports that subprime lenders are nearly twice as likely to be unprofitable as banks, suggesting a fiercely competitive environment. See J. Lane, Associate Director, Division of Supervision, Federal Deposit Insurance Corporation, A Regulator's View of Subprime Lending: Address at the National Automotive Finance Association Non-Prime Auto Lending Conference 6 (June 18–19, 2002) (available in Clerk of Court's case file). By relying on the prime rate, the plurality implicitly assumes that the *prime* lending market is efficient, see *ante*, at 478–479; I see no reason not to make a similar assumption about the *sub*prime lending market.

The second assumption is that the expected costs of default in Chapter 13 are normally no less than those at the

time of lending. This assumption is also reasonable. Chapter 13 plans often fail. I agree with petitioners that the relevant statistic is the percentage of *confirmed* plans that fail, but even resolving that issue in their favor, the risk is still substantial. The failure rate they offer—which we may take to be a conservative estimate, as it is doubtless the lowest one they could find—is 37%. See Girth, The Role of Empirical Data in Developing Bankruptcy Legislation for Individuals, 65 Ind. L. J. 17, 40–42 (1989) (reporting a 63.1% success rate).[1] In every one of the failed plans making up that 37%, a bankruptcy judge had found that "the debtor will be able to make all payments under the plan," 11 U. S. C. § 1325(a)(6), and a trustee had supervised the debtor's compliance, § 1302. That so many nonetheless failed proves that bankruptcy judges are not oracles and that trustees cannot draw blood from a stone.

While court and trustee oversight may provide some marginal benefit to the creditor, it seems obviously outweighed by the fact that (1) an already-bankrupt borrower has demonstrated a financial instability and a proclivity to seek legal protection that other subprime borrowers have not, and

---

[1] The true rate of plan failure is almost certainly much higher. The Girth study that yielded the 37% figure was based on data for a single division (Buffalo, New York) from over 20 years ago (1980–1982). See 65 Ind. L. J., at 41. A later study concluded that "the Buffalo division ha[d] achieved extraordinary results, far from typical for the country as a whole." Whitford, The Ideal of Individualized Justice: Consumer Bankruptcy as Consumer Protection, and Consumer Protection in Consumer Bankruptcy, 68 Am. Bankr. L. J. 397, 411, n. 50 (1994). Although most of respondent's figures are based on studies that do not clearly exclude unconfirmed plans, one study includes enough detail to make the necessary correction: It finds 32% of filings successful, 18% dismissed without confirmation of a plan, and 49% dismissed after confirmation, for a postconfirmation failure rate of 60% (*i. e.,* 49% ÷ (32% + 49%)). See Norberg, Consumer Bankruptcy's New Clothes: An Empirical Study of Discharge and Debt Collection in Chapter 13, 7 Am. Bankr. Inst. L. Rev. 415, 440–441 (1999). This 60% failure rate is far higher than the 37% reported by Girth.

(2) the costs of foreclosure are substantially higher in bankruptcy because the automatic stay bars repossession without judicial permission. See § 362. It does not strike me as plausible that creditors would *prefer* to lend to individuals already in bankruptcy than to those for whom bankruptcy is merely a possibility—as if Chapter 13 were widely viewed by secured creditors as some sort of godsend. Cf. Dunagan, Enforcement of Security Interests in Motor Vehicles in Bankruptcy, 52 Consumer Fin. L. Q. Rep. 191, 197 (1998). Certainly the record in this case contradicts that implausible proposition. See App. 48 (testimony of Craig Cook, sales manager of Instant Auto Finance) ("Q. Are you aware of how other lenders similar to Instant Auto Finance view credit applicants who appear to be candidates for Chapter 13 bankruptcy?" "A. Negative[ly] as well"). The better assumption is that bankrupt debtors are riskier than other subprime debtors—or, at the very least, not systematically *less* risky.

The first of the two assumptions means that the contract rate reasonably reflects actual risk at the time of borrowing. The second means that this risk persists when the debtor files for Chapter 13. It follows that the contract rate is a decent estimate, or at least the lower bound, for the appropriate interest rate in cramdown.[2]

The plurality disputes these two assumptions. It argues that subprime lending markets are not competitive because "vehicles are regularly sold by means of tie-in transactions, in which the price of the vehicle is the subject of negotiation, while the terms of the financing are dictated by the seller."

---

[2] The contract rate is only a presumption, however, and either party remains free to prove that a higher or lower rate is appropriate in a particular case. For example, if market interest rates generally have risen or fallen since the contract was executed, the contract rate could be adjusted by the same amount in cases where the difference was substantial enough that a party chose to make an issue of it.

*Ante,* at 481.[3] Tie-ins do not *alone* make financing markets noncompetitive; they only cause prices and interest rates to be considered *in tandem* rather than separately. The force of the plurality's argument depends entirely on its claim that "the terms of the financing are dictated by the seller." *Ibid.* This unsubstantiated assertion is contrary to common experience. Car sellers routinely advertise their interest rates, offer promotions like "zero-percent financing," and engage in other behavior that plainly assumes customers are sensitive to interest rates and not just price.[4]

---

[3] To the extent the plurality argues that subprime lending markets are not *"perfectly* competitive," *ante,* at 481 (emphasis added), I agree. But there is no reason to doubt they are *reasonably* competitive, so that pricing in those markets is *reasonably* efficient.

[4] I confess that this is "nonresponsive" to the argument made in the plurality's footnote (that the contract interest rate may not accurately reflect risk when set jointly with a car's sale price), see *ante,* at 481, n. 20; it is in response to the quite different argument made in the plurality's text (that joint pricing shows that the subprime lending market is not competitive), see *ante,* at 481. As to the *former* issue, the plurality's footnote makes a fair point. When the seller provides financing itself, there is a possibility that the contract interest rate might not reflect actual risk because a higher contract interest rate can be traded off for a lower sale price and vice versa. Nonetheless, this fact is not likely to bias the contract-rate approach in favor of creditors to any significant degree. If a creditor offers a promotional interest rate—such as "zero-percent financing"—in return for a higher sale price, the creditor bears the burden of showing that the true interest rate is higher than the contract rate. The opposite tactic—inflating the interest rate and decreasing the sale price—is constrained at some level by the buyer's option to finance through a third party, thus taking advantage of the lower price while avoiding the higher interest rate. (If a seller were to condition a price discount on providing the financing itself, the debtor should be entitled to rely on that condition to rebut the presumption that the contract rate reflects actual risk.) Finally, the debtor remains free to rebut the contract rate with any other probative evidence. While joint pricing may introduce some inaccuracy, the contract rate is still a far better initial estimate than the prime rate.

The plurality also points to state and federal regulation of lending markets. *Ante,* at 481–482. It claims that state usury laws evince a belief that subprime lending markets are noncompetitive. While that is one *conceivable* explanation for such laws, there are countless others. One statistical and historical study suggests that usury laws are a "primitive means of social insurance" meant to ensure "low interest rates" for those who suffer financial adversity. Glaeser & Scheinkman, Neither a Borrower Nor a Lender Be: An Economic Analysis of Interest Restrictions and Usury Laws, 41 J. Law & Econ. 1, 26 (1998). Such a rationale does not reflect a belief that lending markets are inefficient, any more than rent controls reflect a belief that real estate markets are inefficient. Other historical rationales likewise shed no light on the point at issue here. See *id.,* at 27. The mere existence of usury laws is therefore weak support for any position.

The federal Truth in Lending Act, 15 U. S. C. § 1601 *et seq.,* not only fails to support the plurality's position; it positively refutes it. The plurality claims the Act reflects a belief that full disclosure promotes competition, see *ante,* at 482, and n. 24; the Act itself says as much, see 15 U. S. C. § 1601(a). But that belief obviously *presumes* markets are competitive (or, at least, that they were noncompetitive only because of the absence of the disclosures the Act now requires). If lending markets were not competitive—if the terms of financing were indeed "dictated by the seller," *ante,* at 481— disclosure requirements would be pointless, since consumers would have no use for the information.[5]

As to the second assumption (that the expected costs of default in Chapter 13 are normally no less than those at the

---

[5] The plurality also argues that regulatory context is relevant because it "distorts the market." *Ante,* at 482. Federal disclosure requirements do not distort the market in any meaningful sense. And while state usury laws do, that distortion works only to the benefit of debtors under the contract-rate approach, since it keeps contract rates artificially low.

time of lending), the plurality responds, not that Chapter 13 *as currently administered* is less risky than subprime lending generally, but that it *would* be less risky, if only bankruptcy courts would confirm fewer risky plans. *Ante*, at 482–483. Of course, it is often quite difficult to predict which plans will fail. See Norberg, Consumer Bankruptcy's New Clothes: An Empirical Study of Discharge and Debt Collection in Chapter 13, 7 Am. Bankr. Inst. L. Rev. 415, 462 (1999). But even assuming the high failure rate primarily reflects judicial dereliction rather than unavoidable uncertainty, the plurality's argument fails for want of any reason to believe the dereliction will abate. While full compensation can be attained either by low-risk plans and low interest rates, or by high-risk plans and high interest rates, it cannot be attained by *high*-risk plans and *low* interest rates, which, absent cause to anticipate a change in confirmation practices, is precisely what the formula approach would yield.

The plurality also claims that the contract rate overcompensates creditors because it includes "transaction costs and overall profits." *Ante*, at 477. But the same is true of the rate the plurality prescribes: The prime lending rate includes banks' overhead and profits. These are necessary components of *any* commercial lending rate, since creditors will not lend money if they cannot cover their costs and return a level of profit sufficient to prevent their investors from going elsewhere. See *Koopmans* v. *Farm Credit Services of Mid-America, ACA,* 102 F. 3d 874, 876 (CA7 1996). The plurality's criticism might have force if there were reason to believe subprime lenders made exorbitant profits while banks did not—but, again, the data suggest otherwise. See Lane, Regulator's View of Subprime Lending, at 6.[6]

---

[6] Some transaction costs are avoided by the creditor in bankruptcy—for example, loan-origination costs such as advertising. But these are likely only a minor component of the interest rate. According to the record in this case, for example, the average interest rate on new-car loans was roughly 8.5%—only about 0.5% higher than the prime rate and 2.5% higher

Finally, the plurality objects that similarly situated creditors might not be treated alike. *Ante,* at 478, and n. 17. But the contract rate is only a presumption. If a judge thinks it necessary to modify the rate to avoid unjustified disparity, he can do so. For example, if two creditors charged different rates solely because they lent to the debtor at different times, the judge could average the rates or use the more recent one. The plurality's argument might be valid against an approach that *irrebuttably* presumes the contract rate, but that is not what I propose.[7]

## II

The defects of the formula approach far outweigh those of the contract-rate approach. The formula approach starts with the prime lending rate—a number that, while objective and easily ascertainable, is indisputably too low. It then ad-

---

than the risk-free treasury rate. App. 43 (testimony of Professor Steve Russell). And the 2% difference between prime and treasury rates represented "mostly . . . risk [and] to some extent transaction costs." *Id.,* at 42. These figures suggest that loan-origination costs included in the new-car loan and prime rates but not in the treasury rate are likely only a fraction of a percent. There is no reason to think they are substantially higher in the subprime auto lending market. Any transaction costs the creditor avoids in bankruptcy are thus far less than the additional ones he incurs.

[7] The plurality's other, miscellaneous criticisms do not survive scrutiny either. That the cramdown provision applies to prime as well as subprime loans, *ante,* at 483–484, proves nothing. Nor is there any substance to the argument that the formula approach will perform better where "national or local economic conditions drastically improved or declined after the original loan was issued." *Ante,* at 484. To the extent such economic changes are reflected by changes in the prime rate, the contract rate can be adjusted by the same amount. See n. 2, *supra.* And to the extent they are not, they present the same problem under either approach: When a party disputes the presumption, the court must gauge the significance of the economic change and adjust accordingly. The difference, again, is that the contract-rate approach starts with a number that (but for the economic change) is reasonably accurate, while the formula approach starts with a number that (with or without the economic change) is not even close.

justs by adding a risk premium that, unlike the prime rate, is neither objective nor easily ascertainable. If the risk premium is typically small relative to the prime rate—as the 1.5% premium added to the 8% prime rate by the court below would lead one to believe—then this subjective element of the computation might be forgiven. But in fact risk premiums, if properly computed, would typically be substantial. For example, if the 21% contract rate is an accurate reflection of risk in this case, the risk premium would be 13%—nearly two-thirds of the total interest rate. · When the risk premium is the greater part of the overall rate, the formula approach no longer depends on objective and easily ascertainable numbers. The prime rate becomes the objective tail wagging a dog of unknown size.

As I explain below, the most relevant factors bearing on risk premium are (1) the probability of plan failure; (2) the rate of collateral depreciation; (3) the liquidity of the collateral market; and (4) the administrative expenses of enforcement. Under the formula approach, a risk premium must be computed in every case, so judges will invariably grapple with these imponderables. Under the contract-rate approach, by contrast, the task of assessing all these risk factors is entrusted to the entity most capable of undertaking it: the market. See *Bank of America*, 526 U. S., at 457 ("[T]he best way to determine value is exposure to a market"). All the risk factors are reflected (assuming market efficiency) in the debtor's contract rate—a number readily found in the loan document. If neither party disputes it, the bankruptcy judge's task is at an end. There are straightforward ways a debtor *could* dispute it—for example, by showing that the creditor is now substantially oversecured, or that some other lender is willing to extend credit at a lower rate. But unlike the formula approach, which requires difficult estimation in every case, the contract-rate approach requires it only when the parties choose to contest the issue.

The plurality defends the formula approach on the ground that creditors have better access to the relevant information. *Ante,* at 484–485. But this is not a case where we must choose between one initial estimate that is too low and another that is too high. Rather, the choice is between one that is far too low and another that is generally reasonably accurate (or, if anything, a bit too low). In these circumstances, consciously choosing the less accurate estimate merely because creditors have better information smacks more of policymaking than of faithful adherence to the statutory command that the secured creditor receive property worth *"not less than* the allowed amount" of its claim, 11 U. S. C. § 1325(a)(5)(B)(ii) (emphasis added). Moreover, the plurality's argument assumes it is plausible—and desirable—that the issue will be litigated in most cases. But the costs of conducting a detailed risk analysis and defending it in court are prohibitively high in relation to the amount at stake in most consumer loan cases. Whatever approach we prescribe, the norm should be—and undoubtedly will be—that the issue is not litigated because it is not worth litigating. Given this reality, it is far more important that the initial estimate be accurate than that the burden of proving inaccuracy fall on the better informed party.

There is no better demonstration of the inadequacies of the formula approach than the proceedings in this case. Petitioners' economics expert testified that the 1.5% risk premium was "very reasonable" because Chapter 13 plans are "supposed to be financially feasible" and "the borrowers are under the supervision of the court." App. 43. Nothing in the record shows how these two platitudes were somehow manipulated to arrive at a figure of 1.5%. It bears repeating that feasibility determinations and trustee oversight do not prevent at least 37% of confirmed Chapter 13 plans from failing. On cross-examination, the expert admitted that he had only limited familiarity with the subprime auto lending market and that he was not familiar with the default rates or the

costs of collection in that market. *Id.*, at 44–45. In light of these devastating concessions, it is impossible to view the 1.5% figure as anything other than a smallish number picked out of a hat.

Based on even a rudimentary financial analysis of the facts of this case, the 1.5% figure is obviously wrong—not just off by a couple percent, but probably by roughly an order of magnitude. For a risk premium to be adequate, a hypothetical, rational creditor must be indifferent between accepting (1) the proposed risky stream of payments over time and (2) immediate payment of its present value in a lump sum. Whether he is indifferent—*i. e.*, whether the risk premium added to the prime rate is adequate—can be gauged by comparing benefits and costs: on the one hand, the expected value of the extra interest, and on the other, the expected costs of default.

Respondent was offered a risk premium of 1.5% on top of the prime rate of 8%. If that premium were fully paid as the plan contemplated, it would yield about $60.[8] If the debtor defaulted, all or part of that interest would not be paid, so the expected value is only about $50.[9] The prime rate itself already includes some compensation for risk; as it turns out, about the same amount, yielding another $50.[10]

---

[8] Given its priority, and in light of the amended plan's reduced debtor contributions, the $4,000 secured claim would be fully repaid by about the end of the second year of the plan. The average balance over that period would be about $2,000, *i. e.*, half the initial balance. The total interest premium would therefore be $1.5\% \times 2 \times \$2,000 = \$60$. In this and all following calculations, I do not adjust for time value, as timing effects have no substantial effect on the conclusion.

[9] Assuming a 37% rate of default that results on average in only half the interest's being paid, the expected value is $\$60 \times (1 - 37\% \div 2)$, or about $50.

[10] According to the record in this case, the prime rate at the time of filing was 2% higher than the risk-free treasury rate, and the difference represented "mostly . . . risk [and] to some extent transaction costs." App. 42 (testimony of Professor Steve Russell); see also Federal Reserve Board, Selected Interest Rates, http://www.federalreserve.gov/ releases/h15/data.htm (as visited Apr. 19, 2004) (available in Clerk of

Given the 1.5% risk premium, then, the total expected benefit to respondent was about $100. Against this we must weigh the expected costs of default. While precise calculations are impossible, rough estimates convey a sense of their scale.

The first cost of default involves depreciation. If the debtor defaults, the creditor can eventually repossess and sell the collateral, but by then it may be substantially less valuable than the remaining balance due—and the debtor may stop paying long before the creditor receives permission to repossess. When petitioners purchased their truck in this case, its value was almost equal to the principal balance on the loan.[11] By the time the plan was confirmed, however, the truck was worth only $4,000, while the balance on the loan was $4,895. If petitioners were to default on their Chapter 13 payments and if respondent suffered the same relative loss from depreciation, it would amount to about $550.[12]

The second cost of default involves liquidation. The $4,000 to which respondent would be entitled if paid in a lump sum reflects the *replacement* value of the vehicle, *i. e.*, the amount it would cost the debtor to purchase a similar used truck. See *Associates Commercial Corp.* v. *Rash*, 520 U. S. 953, 965 (1997). If the debtor defaults, the creditor cannot sell the truck for that amount; it receives only a lesser

---

Court's case file) (historical data showing prime rate typically exceeding 3-month constant-maturity treasury rate by 2%–3.5%). If "mostly" means about three-quarters of 2%, then the risk compensation included in the prime rate is 1.5%. Because this figure happens to be the same as the risk premium over prime, the expected value is similarly $50. See nn. 8–9, *supra*.

[11] The truck was initially worth $6,395; the principal balance on the loan was about $6,426.

[12] On the original loan, depreciation ($6,395 – $4,000, or $2,395) exceeded loan repayment ($6,426 – $4,895, or $1,531) by $864, *i. e.*, 14% of the original truck value of $6,395. Applying the same percentage to the new $4,000 truck value yields approximately $550.

*foreclosure* value because collateral markets are not perfectly liquid and there is thus a spread between what a buyer will pay and what a seller will demand. The foreclosure value of petitioners' truck is not in the record, but, using the relative liquidity figures in *Rash* as a rough guide, respondent would suffer a further loss of about $450.[13]

The third cost of default consists of the administrative expenses of foreclosure. While a Chapter 13 plan is in effect, the automatic stay prevents secured creditors from repossessing their collateral, even if the debtor fails to pay. See 11 U. S. C. § 362. The creditor's attorney must move the bankruptcy court to lift the stay. § 362(d). In the District where this case arose, the filing fee for such motions is now $150. See United States Bankruptcy Court for the Southern District of Indiana, Schedule of Bankruptcy Fees (Nov. 1, 2003) (available in Clerk of Court's case file). And the standard attorney's fee for such motions, according to one survey, is $350 in Indiana and as high as $875 in other States. See J. Cossitt, Chapter 13 Attorney Fee Survey, American Bankruptcy Institute Annual Spring Meeting (Apr. 10–13, 2003) (available in Clerk of Court's case file). Moreover, bankruptcy judges will often excuse first offenses, so foreclosure may require multiple trips to court. The total expected administrative expenses in the event of default could reasonably be estimated at $600 or more.

I have omitted several other costs of default, but the point is already adequately made. The three figures above total $1,600. Even accepting petitioners' low estimate of the plan failure rate, a creditor choosing the stream of future payments instead of the immediate lump sum would be selecting an alternative with an expected cost of about $590 ($1,600 multiplied by 37%, the chance of failure) and an expected

---

[13] The truck in *Rash* had a replacement value of $41,000 and a foreclosure value of $31,875, *i. e.*, 22% less. 520 U. S., at 957. If the market in this case had similar liquidity and the truck were repossessed after losing half its remaining value, the loss would be 22% of $2,000, or about $450.

benefit of about $100 (as computed above). No rational creditor would make such a choice. The risk premium over prime necessary to make these costs and benefits equal is in the neighborhood of 16%, for a total interest rate of 24%.[14]

Of course, many of the estimates I have made can be disputed. Perhaps the truck will depreciate more slowly now than at first, perhaps the collateral market is more liquid than the one in *Rash,* perhaps respondent can economize on attorney's fees, and perhaps there is some reason (other than judicial optimism) to think the Tills were unlikely to default. I have made some liberal assumptions,[15] but also some conservative ones.[16] When a risk premium is off by an order of magnitude, one's estimates need not be very precise to show that it cannot possibly be correct.

In sum, the 1.5% premium adopted in this case is far below anything approaching fair compensation. That result is not unusual, see, *e. g., In re Valenti,* 105 F. 3d 55, 64 (CA2 1997) (recommending a 1%–3% premium over the *treasury* rate— *i. e.,* approximately a 0% premium over prime); it is the entirely predictable consequence of a methodology that tells bankruptcy judges to set interest rates based on highly imponderable factors. Given the inherent uncertainty of the enterprise, what heartless bankruptcy judge can be expected to demand that the unfortunate debtor pay *triple* the prime rate as a condition of keeping his sole means of transportation? It challenges human nature.

---

[14] A 1.5% risk premium plus a 1.5% risk component in the prime rate yielded an expected benefit of about $100, see *supra,* at 501–502, so, to yield $590, the total risk compensation would have to be 5.9 times as high, *i. e.,* almost 18%, or a 16.5% risk premium over prime.

[15] For example, by ignoring the possibility that the creditor might recover some of its undersecurity as an unsecured claimant, that the plan might fail only after full repayment of secured claims, or that an oversecured creditor might recover some of its expenses under 11 U. S. C. § 506(b).

[16] For example, by assuming a failure rate of 37%, cf. n. 1, *supra,* and by ignoring all costs of default other than the three mentioned.

## III

JUSTICE THOMAS rejects both the formula approach and the contract-rate approach. He reads the statutory phrase "property to be distributed under the plan," 11 U. S. C. § 1325(a)(5)(B)(ii), to mean the proposed payments *if made as the plan contemplates,* so that the plan need only pay the risk-free rate of interest. *Ante,* at 487 (opinion concurring in judgment). I would instead read this phrase to mean the right to receive payments that the plan vests in the creditor upon confirmation. Because there is no guarantee that the promised payments will in fact be made, the value of this property right must account for the risk of nonpayment.

Viewed in isolation, the phrase is susceptible of either meaning. Both the promise to make payments and the proposed payments themselves are property rights, the former "to be distributed under the plan" immediately upon confirmation, and the latter over the life of the plan. Context, however, supports my reading. The cramdown option which the debtors employed here is only one of three routes to confirmation. The other two—creditor acceptance and collateral surrender, §§ 1325(a)(5)(A), (C)—are both creditor protective, leaving the secured creditor roughly as well off as he would have been had the debtor not sought bankruptcy protection. Given this, it is unlikely the third option was meant to be substantially *under*protective; that would render it so much more favorable to debtors that few would ever choose one of the alternatives.

The risk-free approach also leads to anomalous results. JUSTICE THOMAS admits that, if a plan distributes a note rather than cash, the value of the "property to be distributed" must reflect the risk of default on the note. *Ante,* at 488–489. But there is no practical difference between obligating the debtor to make deferred payments under a plan and obligating the debtor to sign a note that requires those same payments. There is no conceivable reason why Con-

gress would give secured creditors risk compensation in one case but not the other.

Circuit authority uniformly rejects the risk-free approach. While Circuits addressing the issue are divided over *how* to calculate risk, to my knowledge all of them require some compensation for risk, either explicitly or implicitly. See *In re Valenti, supra,* at 64 (treasury rate plus 1%–3% risk premium); *GMAC* v. *Jones,* 999 F. 2d 63, 71 (CA3 1993) (contract rate); *United Carolina Bank* v. *Hall,* 993 F. 2d 1126, 1131 (CA4 1993) (creditor's rate for similar loans, but not higher than contract rate); *In re Smithwick,* 121 F. 3d 211, 214 (CA5 1997) (contract rate); *In re Kidd,* 315 F. 3d 671, 678 (CA6 2003) (market rate for similar loans); *In re Till,* 301 F. 3d 583, 592–593 (CA7 2002) (case below) (contract rate); *In re Fisher,* 930 F. 2d 1361, 1364 (CA8 1991) (market rate for similar loans) (interpreting parallel Chapter 12 provision); *In re Fowler,* 903 F. 2d 694, 698 (CA9 1990) (prime rate plus risk premium); *In re Hardzog,* 901 F. 2d 858, 860 (CA10 1990) (market rate for similar loans, but not higher than contract rate) (Chapter 12); *In re Southern States Motor Inns, Inc.,* 709 F. 2d 647, 652–653 (CA11 1983) (market rate for similar loans) (interpreting similar Chapter 11 provision); see also 8 Collier on Bankruptcy ¶ 1325.06[3][b], p. 1325–37 (rev. 15th ed. 2004). JUSTICE THOMAS identifies no decision adopting his view.

Nor does our decision in *Rash,* 520 U. S. 953, support the risk-free approach. There we considered whether a secured creditor's claim should be valued at what the debtor would pay to replace the collateral or at the lower price the creditor would receive from a foreclosure sale. JUSTICE THOMAS contends that *Rash* selected the former in order to compensate creditors for the risk of plan failure, and that, having compensated them once in that context, we need not do so again here. *Ante,* at 489. I disagree with this reading of *Rash.* The Bankruptcy Code provides that "value shall be determined in light of the purpose of the valuation and of the

proposed disposition or use of [the] property." 11 U. S. C. § 506(a). *Rash* held that the foreclosure-value approach failed to give effect to this language, because it assigned the same value whether the debtor surrendered the collateral or was allowed to retain it in exchange for promised payments. 520 U. S., at 962. "From the creditor's perspective as well as the debtor's, surrender and retention are not equivalent acts." *Ibid.* We did point out that retention entails risks for the creditor that surrender does not. *Id.,* at 962–963. But we made no effort to correlate that increased risk with the difference between replacement and foreclosure value. And we also pointed out that retention benefits the debtor by allowing him to continue to use the property—a factor we considered "[o]f prime significance." *Id.,* at 963. *Rash* stands for the proposition that surrender and retention are fundamentally different sorts of "disposition or use," calling for different valuations. Nothing in the opinion suggests that we thought the valuation difference reflected the degree of increased risk, or that we adopted the replacement-value standard *in order to compensate* for increased risk. To the contrary, we said that the debtor's "actual use . . . is the proper guide under a prescription hinged to the property's 'disposition or use.'" *Ibid.*

If Congress wanted to compensate secured creditors for the risk of plan failure, it would not have done so by prescribing a particular method of valuing collateral. A plan may pose little risk even though the difference between foreclosure and replacement values is substantial, or great risk even though the valuation difference is small. For example, if a plan proposes immediate cash payment to the secured creditor, he is entitled to the higher replacement value under *Rash* even though he faces no risk at all. If the plan calls for deferred payments but the collateral consists of listed securities, the valuation difference may be trivial, but the creditor still faces substantial risks. And a creditor over-secured in even the slightest degree at the time of bank-

ruptcy derives no benefit at all from *Rash,* but still faces some risk of collateral depreciation.[17]

There are very good reasons for Congress to prescribe full risk compensation for creditors. Every action in the free market has a reaction somewhere. If subprime lenders are systematically undercompensated in bankruptcy, they will charge higher rates or, if they already charge the legal maximum under state law, lend to fewer of the riskiest borrowers. As a result, some marginal but deserving borrowers will be denied vehicle loans in the first place. Congress evidently concluded that widespread access to credit is worth preserving, even if it means being ungenerous to sympathetic debtors.

*       *       *

Today's judgment is unlikely to burnish the Court's reputation for reasoned decisionmaking. Eight Justices are in agreement that the rate of interest set forth in the debtor's approved plan must include a premium for risk. Of those eight, four are of the view that beginning with the contract rate would most accurately reflect the actual risk, and four are of the view that beginning with the prime lending rate would do so. The ninth Justice takes no position on the latter point, since he disagrees with the eight on the former point; he would reverse because the rate proposed here, being above the risk-free rate, gave respondent no cause for complaint. Because I read the statute to require full risk compensation, and because I would adopt a valuation method that has a realistic prospect of enforcing that directive, I respectfully dissent.

---

[17] It is true that, if the debtor defaults, one of the costs the creditor suffers is the cost of liquidating the collateral. See *supra,* at 502–503. But it is illogical to "compensate" for this risk by requiring all plans to pay the full cost of liquidation (replacement value minus foreclosure value), rather than an amount that reflects the possibility that liquidation will actually be necessary and that full payments will not be made.