**In re Christie A. NOWLIN, Debtor.**

**Christie A. Nowlin, Plaintiff,**

**v.**

**Tammac Financial Corporation and Frederick L. Reigle, Trustee, Defendants.**

**Bankruptcy No. 03–20724T.**
**Adversary No. 03–2062.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Feb. 25, 2005.

Dexter K. Case, Esquire, John A. Digiamberardino, Esquire, Case, Digiamberar-dino & Lutz, P.C., Reading, PA, for Debtor/Plaintiff.

James T. Shoemaker, Esquire, Hourigan, Kluger & Quinn, P.C., Kingston, PA, for Defendant, Tammac Financial Corporation.

Frederick L. Reigle, Esquire, Reading, PA, for trustee.

### MEMORANDUM OPINION

THOMAS M. TWARDOWSKI,
Bankruptcy Judge.

Plaintiff, Christie A. Nowlin ("Plaintiff"), filed the above-captioned complaint against Defendant, Tammac Financial Corporation ("Defendant"), seeking to bifurcate and "cram down" Defendant's secured claim to the fair market value of Plaintiff's mobile home, which Plaintiff argues in her brief is approximately $31,000.00.[1] *See* Plaintiff's Brief in Support of Complaint at 18. A trial was held in this proceeding and briefs have been filed by the parties. The threshold issue before this court is whether the mobile home is real or personal property for purposes of 11 U.S.C. § 1322(b)(2).

We begin by noting that, in general, section 506(a) of the Bankruptcy Code, 11 U.S.C. § 506(a), permits a debtor to bifurcate a creditor's allowed claim into secured and unsecured components based upon the fair market value of the collateral. *See McDonald v. Master Fin., Inc. (In re McDonald)*, 205 F.3d 606, 609 (3rd Cir.), *cert. denied* 531 U.S. 822, 121 S.Ct. 66, 148 L.Ed.2d 31 (2000). A chapter 13 debtor's ability to bifurcate an allowed claim is limited, however, by section 1322(b)(2) of the Bankruptcy Code, 11 U.S.C.

---

1. Plaintiff testified that her mobile home has a fair market value of $25,000.00. Notes of Testimony, September 13, 2004 trial ("N.T.") at 38. However, Plaintiff states in her brief that based upon her expert's trial testimony, the fair market value of her mobile home is $31,920.00. *See* Plaintiff's brief at 14.

§ 1322(b)(2), which prohibits a chapter 13 debtor from modifying the rights of secured creditors whose claims are secured only by a security interest in real property that is the debtor's principal residence. *See Nobelman v. American Savings Bank,* 508 U.S. 324, 327, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993). The parties agree that if this Court determines that the subject mobile home constitutes real property, the strictures of section 1322(b)(2) would prevent Plaintiff from bifurcating Defendant's claim.[2] Accordingly, the threshold issue before us is whether Plaintiff's mobile home, which serves as her principal residence, is considered to be real or personal property under Pennsylvania law.

 The parties agree that Pennsylvania law determines whether the mobile home constitutes real or personal property under the facts of this case. It is well established that under Pennsylvania law, chattels used in connection with real estate fall into one of three classes:

First, those which are manifestly furniture, as distinguished from improvements, and not peculiarly fitted to the property with which they are used; these always remain personalty. (citations omitted). Second, those which are so annexed to the property that they cannot be removed without material injury to the real estate or to themselves; these are realty, even in the face of an expressed intention that they should be considered personalty ... (citations omitted). Third, those which, although physically connected with the real estate, are so affixed as to be removable without destroying or materially injuring the chattels themselves, or the property to which they are annexed; these become part of the realty or remain personalty, depending upon the intention of the parties at the time of the annexation; in this class fall such chattels as boilers and machinery affixed for the use of an owner or tenant but readily removable. (citations omitted).

*Clayton v. Lienhard,* 312 Pa. 433, 436–37, 167 A. 321, 322 (1933); *accord Blocker v. City of Philadelphia,* 563 Pa. 559, 563, 763 A.2d 373, 375 (2000). A mobile home falls within the third category noted above, and therefore, we must look to the intention of the parties, examining all of the facts and circumstances of the case, to determine whether the mobile home should be classified as real or personal property. *Appeal of Lantz,* 199 Pa.Super. 310, 184 A.2d 127, 129 (1962). Among the facts and circumstances we shall consider are the following: *(1)* whether the mobile home and the lot on which it sits are owned by the same party; *(2)* whether the mobile home is permanently attached to the land; *(3)* the method by which the mobile home is attached to the land; *(4)* the length of time that the mobile home has been attached to the land; *(5)* the relative ease of moving the mobile home from the land; *(6)* whether the mobile home can be removed from the land without damaging the land; *(7)* whether the mobile home is necessary or essential to the real property; and *(8)* the conduct of the owner and whether it evidences an intent to permanently attach the mobile home to the real property. *See Noll v. Harrisburg Area YMCA,* 537 Pa. 274, 643 A.2d 81, 88 (1994); *Lehmann v. Keller,* 454 Pa.Super. 42, 684 A.2d 618, 622 (1996); *Appeal of Sheetz, Inc.,* 657 A.2d 1011, 1014 (Pa.Cmwlth.Ct.) *appeal denied* 542 Pa. 653, 666 A.2d 1060 (1995); *Appeal of Lantz,* 184 A.2d at 129; *Tammac Corporation v. Hill (In re Hill),* Case No. 1–03–

---

**2.** In other words, the parties agree that Defendant's claim is secured only by a security interest in Plaintiff's mobile home.

01604 (Bankr.M.D.Pa. November 20, 2003);*Fromm v. Frankhouser*, 7 Pa. D & C.3d 560, 1977 WL 269 (Lancaster County 1977); *Central Counties Bank v. Moyer*, 4 Pa. D. & C.3d 304, 1977 WL 383 (Centre County 1977); *Hartman v. Fulton County*, 24 Pa. D. & C.2d 611, 1961 WL 6424 (Fulton County 1961); *In re Coyle Assessment*, 17 Pa. D. & C.2d 149, 1959 WL 7499 (Northampton County 1958).

■ We now turn to the facts of the case before us. As of the date of trial, Plaintiff had resided in the mobile home for almost six years. She does not own the land on which the mobile home sits. Instead, Plaintiff pays $315.00 in monthly lot rent. Plaintiff testified that her "long term intention" was to place the mobile home in the park until she was able to purchase land to which she would then permanently affix the mobile home. Plaintiff financed the purchase of the mobile home over thirty years. She also financed the first year of homeowners' insurance and paid for a second year of homeowners' insurance. The mobile home is attached to the land by cinder blocks and is anchored to the ground; however, it does not rest on a concrete pad or block foundation. The wheels have been removed from the mobile home and are now missing. In addition, the mobile home has skirting, a sky light, storm windows, a window air conditioning unit, a thirty gallon water heater, a furnace, an outdoor lamp post, landscaping, a driveway and two attached decks. Gas, electric, cable television and telephone service are provided to the mobile home.

In light of these facts, we conclude as a matter of law that the mobile home in question is personal property for purposes of section 1322(b)(2). To explain, we begin by noting that the mobile home has not been permanently attached to the land with a concrete wall foundation.[3] Instead, the mobile home sits on individual cinder blocks and can easily be removed from the land without causing damage to the mobile home or to the land. In addition, Plaintiff does not own the land on which the mobile home sits. While the mobile home has been located on this land since Plaintiff purchased it in 1999, Plaintiff's testimony established that she never intended to keep the mobile home in its present location on a permanent basis. N.T. at 37. In fact, Plaintiff does not have a long term lease on the land on which the mobile home sits but instead, pays rent to the owner of the mobile home park on a month-to-month basis. N.T. at 38–39. Furthermore, Plaintiff never surrendered the title to the mobile home to Defendant. Perhaps the most compelling evidence of the intention of the parties, however, lies in the wording of their contract. Had Plaintiff desired to attach the mobile home permanently to the land, Defendant's permission would have been required. Plaintiff at no time requested such consent by Defendant. N.T. at 83, 84; *see* note 4, *infra*. All of these facts weigh against any intent by Plaintiff to attach the mobile home to the real property in a permanent fashion.

Defendant argues that the mobile home should be classified as real property because the wheels have been removed and it is equipped with a sky light, skirting, storm windows, a window air conditioning unit, a thirty gallon water heater, a furnace, an outdoor lamp post, landscaping, a driveway and two attached decks and because it has electric, gas, telephone and cable television service. However, we

---

**3.** In fact, Defendant's expert witness admitted that the mobile home had not been "affixed to the real estate." *See* N.T. at 84.

agree with those courts which have found that mobile homes that are not permanently attached to the land by a concrete foundation do not become real property even though the wheels have been removed and they are equipped with skirting and serviced with water, gas, sewer, electric, telephone and cable television, where the land on which the mobile home sits is not owned by the owner of the mobile home. *Moyer*, 4 Pa. D. & C.3d at 305–06 (court found mobile home to be personal property where mobile home was located on a pad, not on a concrete wall foundation, its wheels were removed, it had partial skirting and was serviced by water, sewer, gas, electric and cable television); *Hartman*, 24 Pa. D. & C.2d at 615–16 (court found mobile home to be personal property where mobile home was not permanently attached to the land, instead mobile home sat on concrete blocks but was serviced by water, electric and cesspool).[4] Moreover, we consider features such as a water heater and a furnace to be essential to any residential living unit. Therefore, the fact that this mobile home is equipped with a water heater and a furnace does not persuade us that it must be classified as real property. Furthermore, while features such as a window air conditioning unit, storm windows, an outdoor lamp post, landscaping and a driveway are not essential to a residential living unit, we do not consider them to be of such a character as to support a finding that the mobile home has been so permanently attached to the land as to become real property. Rather, we consider these features to be amenities which may render the mobile home a more comfortable residential living space, but which, when examined with other factors, do not mandate a finding that the mobile home is real property. Finally, as for the fact that the mobile home is fitted with skirting and has two attached decks, we agree that these features go more to the heart of the issue of whether the mobile home is so permanently attached to the land as to indicate the parties' intent that the mobile home be considered real property. However, we find that these factors are outweighed by the facts that: *(1)* both the skirting and the decks can be removed without harm to the land or to the mobile home; *(2)* the mobile home merely rests on individual cinder blocks and can easily be removed from the land without causing damage to either the mobile home or to the land; *(3)* Plaintiff does not own the land on which the mobile home sits; and *(4)* Plaintiff rents the land on a month-to-month basis, which corroborates her testimony that she never intended to keep the mobile home in its present location on a permanent basis. For all of these reasons, we conclude that the mobile home in question must properly be characterized as personal property.

█ Since we have concluded that the mobile home is personal property, we hold that section 1322(b)(2), which protects the holder of a claim secured only by a security interest in real property that is the debtor's principal residence from bifurcation of its claim, is inapplicable to this case and Plaintiff may bifurcate Defendant's claim under section 506(a). Accordingly,

---

**4.** In addition, we note that our conclusion that the mobile home is personal property is supported by the parties' contract, which states, under the heading "Ownership and Duties Toward Property," as follows:

. . .

 E. The Manufactured Home will remain personal property until this Contract is paid in full. Unless we give you prior written consent, you will not allow the Manufactured Home to become a part of real estate or to otherwise lose its treatment as personal property under applicable law.

. . .

Defendant's Exhibit 1 at p. 3.

we now turn to the issues surrounding the fair market value of Plaintiff's mobile home.

■ Plaintiff argues that the fair market value of her mobile home is approximately $31,000.00, *see* Plaintiff's brief at 18 [5], while Defendant argues that the mobile home has a fair market value of $46,751.00 using the cost approach and $49,500.00 using the comparable sales approach. Having reviewed all of the evidence, we find that the fair market value of the mobile home is $38,000.00.

We note the following evidence: *(1)* Plaintiff purchased the mobile home for $46,100.00 in October of 1999, *see* Exhibit D–1; *(2)* we accept as credible the testimony of Plaintiff's expert, Elmer Murray, that mobile homes generally depreciate in value, rather than appreciate, especially if the owner of the mobile home does not own the land on which the mobile home sits or if the mobile home is not permanently affixed to the land with a concrete foundation. N.T. at 16, 25; and *(3)* Plaintiff credibly testified that the mobile home is in average condition and that the windows do not open correctly, a bathroom ceiling is leaking, a bathroom floor is in need of repair and hole in a kitchen wall requires patching, N.T. at 40–41. In contrast, Defendant's appraisal is based upon the testimony of its expert witness, Keith Pfeiffer, that the mobile home is in excellent condition. N.T. at 121. We note, however, that the mobile homes used as comparable sales by Defendant's expert were all larger than Plaintiff's mobile home, *See* Exhibit D–4, and that Defendant's expert opined that a new mobile home of similar quality and design as the subject mobile home would cost approximately $52,000.00 to $53,000.00. N.T. at 132.[6] Given these discrepancies, we find Defendant's appraisal of the mobile home to be deficient and inflated.

Plaintiff's expert relied upon his experience as an auctioneer and appraiser and concluded that the mobile home has a fair market value of $25.00 per square foot. He further considered his conversations with Premier Mobile Home Sales regarding the sale price of comparable mobile homes. N.T. at 14–25. Based upon Plaintiff's expert's testimony (adjusted to reflect the correct square footage of the mobile home) Plaintiff maintains that the fair market value of the mobile home is $31,920. *See* Plaintiff's brief at 14. However, given the fact that Plaintiff's expert failed to support his opinion testimony with a market based written appraisal (i.e., with comparable sales noted therein), we find Plaintiff's estimate of the fair market value of the mobile home to be deficient and undervalued.

Having reviewed all of the evidence concerning the fair market value of the mobile home, including: *(1)* Plaintiff's credible testimony concerning the condition of the mobile home; *(2)* Plaintiff's expert's credible testimony that mobile homes generally depreciate rather than appreciate in value, especially when they are not permanently attached to the land and when the owner does not also own the land on which the mobile home sits; and *(3)* Defendant's appraisals, we find that the fair market value of the mobile home is $38,000.00. Accordingly, we shall permit Plaintiff to bifurcate and "cram down" Defendant's secured claim of $41,368.28, *see* N.T. at 72; *see also* Plaintiff's brief at 18; Defendant's brief at

---

**5.** *See also* note 1, *supra*.

**6.** Hence, Defendant's expert's estimate of fair market value based on the comparable sales approach (i.e., $49,500) fails to take into account much of a depreciation factor.

22, to $38,000.00 pursuant to 11 U.S.C. § 506(a).

The final issue presented for decision concerns the proper interest rate to be applied on Defendant's "crammed down" claim under Plaintiff's chapter 13 plan pursuant to 11 U.S.C. § 1325(a)(5)(B)(ii), as interpreted by the United States Supreme Court in *Till v. SCS Credit Corporation,* 541 U.S. 465, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004). In *Till,* a plurality of the Supreme Court concluded that the appropriate rate of interest to be applied on a "crammed down" claim pursuant to section 1325(a)(5)(B)(ii) is the rate calculated under the "formula approach," which begins with the national prime rate and then makes an upward adjustment to account for the risk being placed upon the creditor. *Till,* 124 S.Ct. at 1961–62. The Supreme Court further noted that courts have generally approved upward adjustments to the national prime rate of 1% to 3% under the formula approach. *Till,* 124 S.Ct. at 1962. In addition, the Court noted that the evidentiary burden is on the creditor to justify the upward adjustment. The factors to consider when determining the amount of the upward adjustment are the circumstances of the estate, the nature of the security and the duration and feasibility of the debtor's chapter 13 plan. *Till,* 124 S.Ct. at 1961. In the case before us, the parties stipulated that the national prime rate of interest as of the date Plaintiff filed her chapter 13 petition was 4% and as of the date of the trial was 4.5%. N.T. at 7. Based upon the evidence before us, we find that Plaintiff's proposal to pay Defendant 8% interest on its "crammed down" claim un-

der her chapter 13 plan is adequate to compensate Defendant for any risk it may assume under the plan.[7] *Id.* at 1961–62.[8]

---

7. We note that this provides Defendant with an upward risk adjustment of 3½% to 4%, which we believe is more than adequate under the facts of this case and comports with the guidance provided by *Till,* 124 S.Ct. at 1961–62.

8. We further find that Defendant failed to meet its evidentiary burden to justify any further upward adjustment of this 8% rate. *See Till,* 124 S.Ct. at 1961.