**In re Anthony Lephillips MURRAY, and Gail Yvette Murray, Debtors.**

**No. 05–48017 JTL.**

United States Bankruptcy Court, M.D. Georgia, Columbus Division.

Aug. 22, 2006.

Brace W. Luquire, Columbus, GA, for Debtors.

### *MEMORANDUM OPINION*

JOHN T. LANEY, III, Bankruptcy Judge.

This matter came before the Court for hearing on April 4, 2006, for confirmation of Debtors' Chapter 13 plan and the Objection to Confirmation filed by creditor Nuvell Financial Services Corp. (hereinafter, "Nuvell") on January 11, 2006. At the conclusion of the hearing, the Court took the issue of confirmation under advisement, specifically, to consider the meaning of the "hanging paragraph" added to 11 U.S.C. § 1325(a)[1] by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (hereinafter, "BAPCPA"), and to determine whether Debtors' treatment of Nuvell's secured claim in Debtors' Chapter 13 Plan would be consistent with the provisions of the "hanging paragraph."

The Court entered a memorandum opinion and order on June 6, 2006 interpreting the hanging paragraph of § 1325(a) and holding that the treatment of Nuvell's secured claim in Debtors' Chapter 13 Plan was violative of § 1325(a)(*), thus sustaining Nuvell's objection and ordering Debtors file a modification of their plan. On June 16, 2006, Debtors filed a motion to reconsider the Court's opinion and order. A hearing on Debtors' motion to reconsider was held on July 18, 2006.

Debtors posed four arguments in support of their motion to reconsider: (1) The language of § 1325(a)(*) does not prohibit "the stripping down of the lien or cramdown or bifurcation of the creditor's claim"; (2) The Court's reliance on *In re*

---

1. Hereinafter, for ease of identification, the "hanging paragraph" of § 1325(a) will be referred to as " § 1325(a)(*)."

*Johnson*[2] for the proposition that despite the purchase of items other than the vehicle, Nuvell still held a purchase money security interest in the vehicle, was improper being that the court in *Johnson* did not make that finding and that such an argument was not made; (3) The court did not consider the argument raised by Debtors at the April 4, 2006 hearing that the secured claim of Nuvell could still be bifurcated under the authority of § 1322, which states that a Chapter 13 plan may modify the rights of a secured creditor; and (4) Claims qualifying under § 1325(a)(*) are not entitled to the present value protection provided for in § 1325(a)(5)(B)(ii), such protection provided in the form of a "prime plus risk factor" interest rate as set forth by the United States Supreme Court in the case of *Till v. SCS Credit Corp.*[3]

 In the case of *In re Barber,*[4] the Court set forth the standard applied when addressing motions to reconsider. A motion for reconsideration, which is treated as a motion to alter or amend a judgment, is governed by FED.R.CIV.P. 59(e). Rule 59(e) grants bankruptcy courts license to reconsider orders and judgments after their entry.[5] The Court explained in *Barber,* that a Rule 59(e) motion is not intended to provide the parties with an opportunity to relitigate previously decided matters or argue new theories of law, but that Rule 59(e) motions are intended to allow for the correction of manifest errors of fact or law, or for the presentation of relevant evidence not previously discoverable.[6] Put precisely, there are three pri-

mary reasons why a court may grant a Rule 59(e) motion to reconsider: "(1) [A]n intervening change of controlling law has occurred; (2) Evidence not previously available has become available; and (3) [Granting the motion] is necessary to correct a clear error of law or prevent manifest injustice."[7]

Consistent with the discussion in *Barber,* the Court, at the July 18, 2006 hearing, orally granted Debtors' motion to reconsider a portion of its June 6, 2006 memorandum opinion. The basis for the Court's ruling was Debtors' contention that the Court misapplied the case of *In re Johnson* in reaching its conclusion that creditor Nuvell held a purchase money security interest in Debtors' vehicle. The Court has carefully considered Debtors' other contentions of error and the case law and argument presented in favor of each, but holds that only the discussion of creditor Nuvell's purchase money security interest shall be revisited. The substance of the June 6 memorandum opinion shall remain unchanged otherwise. Brief mention of Debtors' other arguments will be made in this introduction. For the reasons given below, the Court, consistent with its final conclusion on the issue in its original opinion, finds that creditor Nuvell does, in fact, hold a purchase money security interest in Debtors' vehicle. The final outcome as reached in the June 6 opinion will not be changed, therefore.

Regarding Debtors' first contention that the Court misinterpreted § 1325(a)(*), al-

---

**2.** 337 B.R. 269 (Bankr.M.D.N.C.2006).

**3.** 541 U.S. 465, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004). Debtors rely on the case of *In re Taranto,* 344 B.R. 857 (Bankr.N.D.Ohio 2006), for this proposition.

**4.** 318 B.R. 921 (Bankr.M.D.Ga.2004) (Laney, J.).

**5.** *Barber,* 318 B.R. at 923 (citing *In re Nosker,* 267 B.R. 555, 564 (Bankr.S.D.Ohio 2001) and *In re Homestead Partners, Ltd.,* 201 B.R. 1014 (Bankr.N.D.Ga.1996)).

**6.** *Id.* (citing *Nosker,* 267 B.R. at 564).

**7.** *Id.* at 924 (citing *In re Christie,* 222 B.R. 64, 67 (Bankr.D.N.J.1998)).

though Debtors refer the Court to the recent case of *In re Wampler*[8] to support an interpretation of § 1325(a)(*) different from the interpretation given the Section by the Court in its June 6 memorandum opinion, the Court is not persuaded by the reasoning of that case and will not revisit the issue of the meaning of § 1325(a)(*). The decision in *Wampler* is not binding authority and the Court remains confident that the logic and reasoning of its decision on that issue is correct. In fact, since the issuance of the Court's original memorandum opinion, at least three other bankruptcy courts have joined the majority of courts holding that § 1325(a)(*) merely serves to prevent the bifurcation of qualifying claims under § 506(a)[9] and that the *Till* rate of interest should be paid on such claims.[10]

As to Debtors' third contention that the court did not consider the argument raised by Debtors at the April 4, 2006 hearing that the secured claim of Nuvell could still be bifurcated under the grant of authority in § 1322, which states that a Chapter 13 plan may modify the rights of a secured creditor, the Court holds that such argument has no basis. Congress adopted § 1325(a)(*) to specify treatment particular to claims qualifying under that Section. It would be misguided to presume that § 1322(b)(2), a general provision on modification, could be used to side-step § 1325(a)(*), a provision that specifically prohibits the type of modification Debtors are arguing can be done using § 1322.

Debtors' fourth contention was presented in a letter brief submitted to the Court following the July 18 hearing on their motion. In their brief, Debtors challenged the holding of the Court that the "prime plus risk factor" interest rate set forth by the United States Supreme Court in *Till* should be paid on claims qualifying under § 1325(a)(*). Debtors cited the case of *In re Taranto*,[11] a recent decision by the Bankruptcy Court for the Northern District of Ohio, for the proposition that holders of claims qualifying under § 1325(a)(*) are not entitled to the *Till* prime-plus rate of interest.

As said above, the Court is not convinced of an error in its interpretation that § 1325(a)(*) serves merely to prevent bifurcation under § 506 and, for the reasons discussed, that a claim qualifying under § 1325(a)(*) should still be considered an "allowed secured claim" for purposes of applying § 1325(a)(5) and that Section's present value requirement. Further, nothing in § 1325(a)(*) states that *Till* is no longer applicable, therefore, if § 1325(a)(5) applies, the requirements of *Till* will apply until Congress instructs otherwise. It should be noted, as the Findings of Fact below indicate, that Debtors' plan proposed that an eight percent interest rate be paid on Nuvell's claim and that Nuvell made no arguments at the April 4, 2006 hearing as to an otherwise appropri-

---

**8.** 345 B.R. 730 (Bankr.D.Kan.2006) (holding that claims qualifying under § 1325(a)(*) are "allowed" claims, but not "allowed secured" claims for purposes of § 1325(a)(5) and its present value requirement; as such, claims qualifying under § 1325(a)(*) must be paid in accordance with the full value of the debt, if debtor decides to keep the vehicle, but no interest must be paid on that claim).

**9.** Debtors argue that § 1325(a)(*) goes further and that claims qualifying under the Section

are not "allowed secured claims" for purposes of § 1325(a)(5) and its present value requirement.

**10.** *See In re Sparks*, 346 B.R. 767 (Bankr. S.D.Ohio 2006); *In re Bufford*, 343 B.R. 827 (Bankr.N.D.Tex.2006); *In re Brooks*, 344 B.R. 417 (Bankr.E.D.N.C.2006).

**11.** 344 B.R. 857 (Bankr.N.D.Ohio 2006).

ate rate. Considering that Debtors proposed to pay Nuvell a prime-plus rate of interest, such treatment would have likely been confirmable but for the anti-bifurcation requirements of § 1325(a)(*) and Nuvell's objection as to the claim amount.

The following will be the opinion of the Court, substantively identical to that opinion issued in this case on June 6, 2006 but for the discussion regarding the purchase money security interest of Nuvell. As stated above, although the discussion is amended, the end result remains unchanged.

### FINDINGS OF FACT

On August 1, 2004, Debtors Anthony and Gail Murray purchased a 2003 Oldsmobile Alero automobile (hereinafter, the "vehicle") from Bill Heard Chevrolet Co. (hereinafter, "Bill Heard") pursuant to the terms of a retail installment contract (hereinafter, the "Contract"). Bill Heard assigned its interest in the Contract to Nuvell. The vehicle was acquired for the "personal, family or household"[12] use of Debtors. As evidenced by the Contract, the purchase of the vehicle included a $700 payment for an extended service contract, a documentary fee of $344, and a government certificate of title fee of $18. The vehicle is subject to a secured claim held by Nuvell. A Georgia Certificate of Title was issued on September 2, 2004, indicating Nuvell holds a first priority purchase money security interest in the vehicle.

Debtors filed their petition for Chapter 13 protection on November 15, 2005.[13] Debtors purchased the vehicle within 910 days prior to filing their petition for bankruptcy. Nuvell filed a proof of claim on November 28, 2005 contending that the net amount due to Nuvell, as of the petition date, was $10,498.63. No objection to Nuvell's proof of claim was filed.

The scheduled value of the vehicle as of the date of Debtors' petition was $8,612.00. On December 19, 2005, Debtors proposed a Chapter 13 plan providing that the secured claim of Nuvell should be paid to the extent of $8,612.00 plus interest at eight percent per annum, thus attempting to "cram down" the value of Nuvell's secured claim. On January 11, 2006, Nuvell objected to the confirmation of Debtors' proposed plan on the basis that Nuvell's claim qualified under § 1325(a)(*) and could no longer be crammed down under § 506.

### DISCUSSION AND CONCLUSIONS OF LAW

The issue before the Court is whether Debtors can "cram-down" the lien of a secured creditor considering the terms of § 1325(a)(*) where the collateral is a motor vehicle, the motor vehicle was purchased by Debtors for personal use within 910 days of the filing of Debtors' petition, and the purchase price for the motor vehicle included the purchase of a service contract, a documentary fee, and a certificate of title fee. To also be considered by the Court, is the applicable post-petition interest rate to be applied to the repayment of secured claims qualifying under § 1325(a)(*).

### I. Qualification under BAPCPA § 1325(a)(*)

█ Although the ultimate issue of this inquiry is the meaning the Court will give to § 1325(a)(*), that issue cannot and should not be reached until it is deter-

---

**12.** *See* Retail Installment Contract at 1, attached to Debtors' Brief.

**13.** Debtors filed their petition after October 17, 2005, the effective date of the BAPCPA provisions germane to the issue before the Court.

mined that the claim of Nuvell qualifies for treatment under § 1325(a)(*). In order for a claim to qualify the three following requirements must be met: (1) The creditor must have a purchase money security interest; (2) The purchase money security interest must be in a motor vehicle acquired for the debtor's personal use; and (3) The debt secured by the motor vehicle must have been incurred within 910 days of the filing of the debtor's Chapter 13 petition.[14]

Although requirements (2) and (3) are clearly met, Debtors argue that Nuvell's claim does not qualify for treatment under § 1325(a)(*) because Nuvell does not hold a purchase money security interest in Debtors' vehicle. Specifically, Debtors contend that because the debt was incurred not only for the purchase of the vehicle, but also for the purchase of an extended service contract, payment of a documentary fee, and payment of a certificate of title fee, the security interest of Nuvell is not one in purchase money.[15] Debtors, however, offer no real support for this contention.

■ As Debtors mention in their response brief, whether a creditor's security interest is one in purchase money is a determination to be made under state law.[16] Official Code of Georgia Annotated § 11–9–103 provides the following, in relevant part, as regards "purchase money security interests":

**Purchase money security interest; application of payments; burden of establishing**

(a) *Definitions.* As used in this Code section, the term:

(1) "Purchase money collateral" means goods or software that secures a purchase money obligation incurred with respect to that collateral.

(2) "Purchase money obligation" means an obligation of an obligor incurred as all or part of the **price** of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used.

(b) *Purchase money security interest in goods.* A security interest in goods is a purchase money security interest:

(1) To the extent that the goods are purchase money collateral with respect to that security interest;

(2) If the security interest is in inventory that is or was purchase money collateral, also to the extent that the security interest secures a purchase money obligation incurred with respect to other inventory in which the secured party holds or held a purchase money security interest; and

(3) Also to the extent that the security interest secures a purchase money obligation incurred with respect to software in which the secured party holds or held a purchase money security interest . . . . [17]

The meaning of the term "price" as used in the Section's definition of "Purchase money obligation" is brought to issue by Debtors' argument that the simultaneous purchase of the extended service contract, the documentary fee, and the governmental certificate of title fee disqualified Nuvell's security interest from being one in purchase money. Considering all portions of O.C.G.A. § 11–9–103, if the cost of the

---

14. 11 U.S.C. § 1325(a)(*) (2005).

15. Debtors' Brief at 14–20.

16. Debtors' Brief at 14.

17. O.C.G.A. § 11–9–103 (2002) (emphasis added).

three items can be considered part of the "price" of Debtors' vehicle, then Nuvell would have a purchase money security interest in the vehicle. The Court is assisted somewhat in this determination by Uniform Commercial Code Comment 3 to the Section, which provides in relevant part:

> As used in subsection (a)(2), the definition of "purchase-money obligation," the "price" of collateral or the "value given to enable" includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations.[18]

The documentary fee and the governmental certificate of title fee are clearly "expenses incurred in connection with acquiring rights in the collateral," easily labeled as finance or administrative charges. The question of whether the cost of the extended service contract fits within this category of expenses incurred in connection with acquiring rights in the collateral does require closer consideration.

The Court's inclination that such an added expense should be considered part of the price of the vehicle is supported not only by the Court's varied experience with transactions of this type, but also by the fact that there is no case law, either cited by Debtors or found by the Court while conducting its own research, holding that the purchase of an extended service contract or warranty contemporary with the purchase of the collateral would disqualify a security interest from being one in purchase money. In fact, Debtors cite to a case in their brief that indirectly holds otherwise. In *In re Staley*,[19] the District Court considered, on appeal, whether a creditor retained its purchase money security interest in a stereo when the debtor subsequently purchased a freezer and warranty, signing a new, but identical security agreement, and on two other occasions purchased automobile maintenance and service under the same agreement.[20] The language of the security agreements granted the creditor a security interest in each item of merchandise purchased or thereafter purchased.[21] There was a proviso in the agreements, however, stating that the creditor would retain such security interest in *each item* only until *it* was paid for in full.[22] The agreements then set forth a formula for how the installment payments would be applied to each of the items purchased.[23]

The Bankruptcy Court below in *Staley* held that the creditor had a security interest only in the freezer, relying on the case of *In re Manuel*[24] for its conclusion. The

---

18. O.C.G.A. § 11–9–103, cmt. n. 3 (2002).

19. 426 F.Supp. 437 (M.D.Ga.1977) (Owens, J.).

20. *Staley,* 426 F.Supp. at 437.

21. *Id.*

22. *Id.*

23. *Id.*

24. 507 F.2d 990 (5th Cir.1975). *In re Manuel* involved an "add-on" clause in a security

agreement whereby the debtor's initial and subsequent purchases under that agreement secured the entire indebtedness, never allowing the debtor to acquire title in any of the property until the entire debt was paid. As the debtor made payments, the creditor's security interest in all of the property served to secure only the more recent purchases. The creditor did not file a financing statement, but argued that it was still secured by all of the property purchased being as the creditor held a purchase money security interest and no filing was necessary. The Fifth Circuit Court of Appeals held that because the security agreement "purported to make collateral se-

District Court reversed, holding that "[b]ecause the collateral secured only debt representing its price, the security agreement did create a purchase money security interest which, being in a consumer good, did not need to be filed in order to be perfected."[25] The reason this case is so helpful in deciding the issue before this Court is that in the District Court's recitation of facts, it is expressed that "the debtor purchased on credit a stereo, *extended warranty contract, and credit life insurance*" from the creditor.[26] In its holding, the Court stated that the creditor did have a purchase money security interest "[b]ecause the collateral secured only debt representing its *price* ...."[27] Granted, the debtor apparently did not argue in *Staley* that a finding of a purchase money security interest was precluded by the purchase of additional items, the Court can infer from the recitation of facts and the final conclusion of the District Court that the purchase of the extended warranty contract and credit life insurance were considered and did not disqualify the security interest from purchase money status.[28] This is understandable being that an extended service contract or warranty is so inextricably related to the collateral that the purchase of these or similar items would be considered part of the *price* of the collateral.

In trying to convince the Court otherwise, Debtors, in their arguments and case citations, attempt to implicate the "transformation" rule, which holds that a "purchase money security interest used to secure the purchase price of goods sold in a particular transaction is 'transformed' into a nonpurchase money security interest when antecedent or after-acquired debt is consolidated with [a] new purchase under one contract."[29] The rule evolved in response to attempts by creditors to secure combined debts with items purchased at different times.[30] In this circumstance, each item of collateral would secure not only its purchase price, but also the purchase price of the other goods.[31] The transformation rule may also apply in cases of refinancing where the creditor increases the interest rate and increases the loan amount.[32]

The general rules adopted for "transformation" scenarios are simply of no help to the issue the Court must decide today, *i.e.*, whether Debtors' additional purchases should be included as part of the "price" of their vehicle. Debtors cite the case of *In re Lee*[33] for the rule that "A purchase money security interest cannot exceed the price of what is purchased in the transaction wherein the security interest is creat-

---

cure more than its own price, it was not a purchase money security interest entitled to be perfected without filing." *Staley*, 426 F.Supp. at 438 (citing *In re Manuel*, 507 F.2d at 993).

**25.** *Staley*, 426 F.Supp. at 438.

**26.** *Id.* at 437.

**27.** *Id.* at 438.

**28.** In *Staley*, the District Court considered an older version of the Georgia statute defining "purchase money security interest," but as Debtors stated in their brief, cases decided

under the old statute remain good law under the revised version of the statute.

**29.** *In re Lee*, 169 B.R. 790, 792–93 (Bankr. S.D.Ga.1994) (citing *In re Freeman*, 124 B.R. 840, 843 (N.D.Ala.1991), aff'd, 956 F.2d 252 (11th Cir.1992)). *See Manuel*, 507 F.2d at 992.

**30.** *In re Norrell*, 426 F.Supp. 435, 436 (M.D.Ga.1977).

**31.** *Id.*

**32.** *See In re Hillard*, 198 B.R. 620, 624 (Bankr.N.D.Ala.1996).

**33.** 169 B.R. 790.

ed."[34] Applying this general rule requires the Court to determine what is meant by the term "price." In *Lee*, the court was considering a multiple transaction scenario, and as such, the court in *Lee* was certainly considering "price" in terms of the price of the initial purchase compared with the price of the subsequent purchases. The court was not considering whether additional items purchased with the collateral prevented the creation of a purchase money security interest in the collateral.

Debtors also cite the case of *In re Fickey* for the general rule that "[t]o the extent an item of collateral secures some other kind of debt, the security interest in the item is not purchase money."[35] Debtors failed to include the example of "some other kind of debt" given by the court in *Fickey*, which was "antecedent debt."[36] The court in *Fickey* developed its rule in the context of a multiple transaction scenario. The court was not considering whether the cost of additional items purchased with the collateral was "some other kind of debt," such that would render a security interest nonpurchase money. The rule in *Fickey*, therefore, is also not helpful to the Court in its inquiry.

Finally, Debtors cite the cases of *Southtrust Bank of Alabama, Nat'l Ass'n v. Borg–Warner Acceptance Corp.*[37] and *In re Hillard*[38] for the rule that a purchase money security interest cannot exceed the *price* of what is purchased in the transaction wherein the security interest is created. Again, this rule begs the question of what meaning the term "price" should be given. None of the cases cited by Debtors involves the scenario before the Court today. The instant case clearly does not involve a "transformation" scenario or even a refinancing scenario. As such, this case is clearly distinguishable from the cases cited by Debtors and the rules developed in each are not applicable. The Court, therefore, concludes that because of the nature of the additional items purchased and the relationship between those items and the collateral, which were purchased at the same time and in the same transaction as the collateral, Nuvell does indeed hold a purchase money security interest in Debtors' vehicle. This conclusion is supported by the facts and conclusion of *In re Staley*,[39] a case decided in this District. The Court's finding that Nuvell holds a purchase money security interest satisfies the only remaining requirement for application of § 1325(a)(*).

## II. The Meaning of BAPCPA § 1325(a)(*)

The requirements for confirmation of a Chapter 13 plan are set forth in § 1325 of the Code. Subsection (a)(5) provides for the required treatment of "allowed secured claims."[40] With the enactment of BAPCPA on October 17, 2005, § 1325(a)(5) is now qualified by an unnumbered, hanging paragraph located at the end of subsection (a), § 1325(a)(*). Section 1325(a)(*) provides:

> For purposes of paragraph (5), section 506 shall not apply to a claim described

---

**34.** Debtors' Brief at 15 (citing *In re Lee*, 169 B.R. at 792 (citations omitted)).

**35.** *Id.* (citing *In re Fickey*, 23 B.R. 586, 588 (Bankr.E.D.Tenn.1982) (citations omitted)). *See Freeman*, 956 F.2d at 254–55.

**36.** *Fickey*, 23 B.R. at 588.

**37.** 760 F.2d 1240 (11th Cir.1985).

**38.** 198 B.R. 620 (Bankr.N.D.Ala.1996).

**39.** 426 F.Supp. 437.

**40.** 11 U.S.C. § 1325 (2005) (the subject matter of the Section was not changed with the enactment of BAPCPA).

in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910–day preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor, or if collateral for that debt consists of any other thing of value, if the debt was incurred during the 1–year period preceding that filing. . . . [41]

Section 506, as referenced in § 1325(a)(*), allows for the bifurcation of an under-secured creditor's claim into a secured and unsecured portion, with the result that a creditor's claim is allowed as secured only to the extent of the *value* of the collateral securing its debt. This process of bifurcation is referred to as "cram-down."

Prior to the enactment of BAPCPA and § 1325(a)(*), Chapter 13 debtors would, pursuant to § 1322(b)(2), modify the rights of a secured creditor through the cram-down procedure provided for in § 506(a)(1). The portion of the creditor's claim allowed as secured would be paid with interest, whereas the unsecured portion of the claim would be paid pro-rata

with all other general unsecured claims. The Court must now determine the meaning of § 1325(a)(*) and that new section's effect on the cram-down procedures so often employed by debtors.

Debtors in this case argue that the language of § 1325(a)(*) that "section 506 shall not apply" means that claims qualifying under § 1325(a)(*) are not "allowed secured claims" as contemplated by § 1325(a)(5). If the claims are not "allowed secured claims," then they do not fall within the purview of § 1325(a)(5)(B)(ii) and that section's requirement that each allowed secured claim be paid according to its present value.[42]

■ Since the effective date of BAPCPA in October of 2005, several courts across the nation have considered the meaning of § 1325(a)(*). All of the courts but two have held that § 1325(a)(*) "means only that the claims [the Section] describes cannot be bifurcated into secured and unsecured portions under § 506(a)." [43] This Court agrees with the majority.

In particular, the Court agrees with the reasoning and conclusion set forth in *In re Brown*.[44] There, the court considered ar-

---

**41.** 11 U.S.C. § 1325(a)(*) (2005).

**42.** *See* Debtors' Brief at 6–7.

**43.** *In re Brown*, 339 B.R. 818, 820 (Bankr. S.D.Ga.2006) (Dalis, J.). *See In re Sparks*, 346 B.R. 767 (Bankr.S.D.Ohio 2006); *In re Bufford*, 343 B.R. 827 (Bankr.N.D.Tex.2006); *In re Brooks*, 344 B.R. 417 (Bankr.E.D.N.C. 2006); *In re Montoya*, 341 B.R. 41, 44 (Bankr.D.Utah 2006) (holding that the beginning phrase of § 1325(a)(*), "For purposes of paragraph (5)," requires that the court consider § 1325(a)(5) when contemplating confirmation; thus, a claim qualifying under § 1325(a)(*) is still an "allowed secured claim" and § 1325(a)(*) only prevents bifurcation under § 506); *In re Horn*, 338 B.R.

110, 113 (Bankr.M.D.Ala.2006) (holding that § 1325(a)(*) prevents bifurcation under § 506 of claims meeting the three requirements of § 1325(a)(*)); *Johnson*, 337 B.R. at 273 (Bankr.M.D.N.C.2006) (holding that § 1325(a)(*) prevents purchase money security loans on vehicles purchased for the personal use of the debtor within 910 days of the filing of the petition from being stripped down in a Chapter 13 plan). *But see In re Carver*, 338 B.R. 521 (Bankr.S.D.Ga.2006) (Walker, J.) (holding that a 910–day vehicle claim is neither an unsecured claim nor an allowed secured claim and that § 1325(a)(5) is not applicable to 910–day vehicle claims); *Wampler, supra* note 8.

**44.** 339 B.R. 818.

guments similar to the arguments now before this Court. The several debtors in *Brown* all purchased vehicles for personal use within 910 days before filing a Chapter 13 petition. Creditors with liens on those vehicles filed proofs of claim stating that the debts for the vehicles were 100% (percent) secured. No objections were made to the proofs of claim, nor was it argued that the vehicles were not purchased for personal use. The debtors' proposed plans that estimated the claims, listing them as "fully secured allowed claims," and proposed repayment at zero percent interest. The 910–day creditors objected to confirmation of the debtors' Chapter 13 plans, arguing that the creditors holding allowed secured claims should be paid the present value of their claims in accordance with § 1325(a)(5).

The court in *Brown* was not persuaded by the debtors' argument that § 1325(a)(*) prohibited application of § 506 and in so doing prevented 910–day claims under § 1325(a)(*) from being considered "allowed secured claims." The court did not agree with the debtors that § 1325(a)(5)(B)(ii)'s requirement that "allowed secured claims" be paid on the basis of the claim's present value did not apply to claims qualifying under § 1325(a)(*).[45]

■ The court in *Brown* stated, and this Court agrees, that if a debtor contends that without the operation of § 506 an "allowed secured claim" cannot exist, then that debtor "misunderstands the purpose and operation of § 506."[46] The discussion

of this issue in *Brown* begins with a citation to the United States Supreme Court case of *Dewsnup v. Timm*[47] where the Supreme Court agreed with the argument that:

> the words "allowed secured claim" in § 506(d) need not be read as an indivisible term of art defined by reference to § 506(a), *which by its terms is not a definitional provision.* Rather, the words should be read term-by-term to refer to any claim that is, first, allowed, and, second, secured.[48]

The court in *Brown* stated that "the relationship between § 506(a) and 'allowed secured claim' in § 506(d), [established in *Dewsnup* ], also applies to the relationship between § 506(a) and 'allowed secured claim' in § 1325(a)(5) permitting bifurcation of an allowed claim under § 506(a) into secured and unsecured portions in contravention of nonbankruptcy law, nothing more."[49] The Court agrees with *Brown* that it is unnecessary and inappropriate to "contort" § 506(a) into a definitional provision where other sections of the Code address whether a claim is "allowed" and/or "secured."[50]

As stated both in *Brown* and by counsel in briefs, § 502(a) determines whether a claim is deemed "allowed."[51] Section 502(a) provides in relevant part: "(a) A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case

---

**45.** *Id.* at 820.

**46.** *Id.* at 821.

**47.** 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992).

**48.** *Id.* at 415, 112 S.Ct. 773 (emphasis added) (construing the relationship between § 506(a) and the phrase "allowed secured claim" in

§ 506(d), the Supreme Court agreed with this argument of the respondent and the United States stating that it was sensical).

**49.** *Brown,* 339 B.R. at 821.

**50.** *Id.*

**51.** *Id. See* Debtors' Brief at 4–5; Creditor's Brief at 5–6.

under chapter 7 of this title, objects." [52] As in *Brown*, no objections have been filed in this case to the Nuvell proof of claim. In accordance with § 502(a), therefore, the 910–day claim of Nuvell is deemed "allowed."

The Court must look to § 101(37) to determine whether a debt is "secured" by a lien. [53] Section 101(37) provides: "The term 'lien' means charge against or interest in property to secure payment of a debt or performance of an obligation." [54] As in *Brown*, there is no argument that Nuvell does not hold a valid lien against Debtors' vehicle that secures payment of the underlying debt. As such, the claim of Nuvell is "secured."

In *Brown*, the court held that because the 910–day claims were deemed "allowed" under § 502(a) and "secured" under § 101(37), the claims were "allowed secured claims" and § 1325(a)(5) would apply to require payment of those claims on the basis of their present value. [55] Regarding the 910–day claim of Nuvell in this case, this Court concludes likewise.

The Court is satisfied that the identification of a claim as "allowed" and "secured" would be sufficient to overcome Debtors' argument that § 1325(a)(5) would not apply to claims qualifying under § 1325(a)(*), but there are other sound reasons why Debtors' argument must fail. As pointed out in *In re Montoya*, [56] non-bankruptcy substantive law usually determines the existence of a creditor's claim, while the *valuation* of that claim is deter-mined by § 506. Whether that claim is *secured* is a matter of contract and applicable perfection statutes. [57] This Court agrees with the conclusion reached in *Montoya* that "[a] creditor's secured status is not erased without any further adjudication merely because the hanging paragraph makes the § 506 valuation mechanism inapplicable to 910–day vehicle claims." [58]

In *Montoya*, it is also noted that the grammatical structure of § 1325(a)(*) supports the conclusion that § 1325(a)(5) is still applicable to claims qualifying under § 1325(a)(*). The hanging paragraph begins with the phrase: "For purposes of paragraph (5) ..." It should follow then that where a claim qualifies under § 1325(a)(*), a court must consider § 1325(a)(5) when contemplating confirmation. [59]

As pointed out in the case of *In re Turner*, [60] the conclusion that § 1325(a)(*) serves only to prevent the bifurcation of an allowed secured claim under § 506 is also strongly supported by the legislative history to § 1325(a)(*). A 2005 House Report on the new provisions of BAPCPA provides:

**Protections for Secured Creditors.** S. 256's protections for secured creditors *include a prohibition against bifurcating a secured debt* incurred within the 910–day period preceding the filing of a bankruptcy case if the debt is secured by a purchase money security interest in a motor vehicle acquired for the debtor's personal use. Where the collateral con-

---

52. 11 U.S.C. § 502(a) (2005).

53. *See Brown*, 339 B.R. at 821.

54. 11 U.S.C. § 101(37) (2005).

55. *Brown*, 339 B.R. at 821.

56. *Montoya*, 341 B.R. at 44.

57. *Id.*

58. *Id.*

59. *Id.*

60. *In re Turner*, 349 B.R. 437, 441–42 (Bankr. D.S.C.2006).

sists of any other type of property having value, S. 256 prohibits bifurcation of specified secured debts if incurred during the one-year period preceding the filing of the bankruptcy case.[61]

Further, members of Congress dissenting to the enactment of BAPCPA also recognized:

*[S. 256] would largely eliminate the possibility of loan bifurcations in chapter 13 cases.* Under current law a debtor is permitted to bifurcate a loan between the secured and unsecured portions. The debt is treated as a secured debt up to the allowed value of the property securing the debt. The remainder of the debt is treated as a non-priority unsecured debt. Section 306 of [S. 256] prevents such bifurcation (including with regard to interest and penalty provisions) with respect to any loan for the purchase of a vehicle in the 910 days before bankruptcy, as well as all loans secured by other property incurred within one year before bankruptcy.[62]

Considering this legislative history, the grammatical structure of § 1325(a)(*), and the definitions of the terms "allowed" and "secured" found elsewhere in the Code, the Court holds that the only sound conclusion is that a claim qualifying under § 1325(a)(*) may be considered an "allowed secured claim" for purposes of § 1325 and would be, therefore, subject to the present interest requirement of § 1325(a)(5).

## III. Applicable Interest Rate

 Although Debtors in this case do not, in the alternative, address the appropriate interest rate to be paid should the Court conclude that Nuvell's claim is an "allowed secured claim," the Court believes that for direction in this and in other cases concerning similar issues, the applicable post-petition interest rate should be discussed.

Under the authority granted in § 1322(b)(2), a Chapter 13 plan may "modify the rights of any creditor whose claim is secured by an interest in anything other than 'real property that is the debtor's principal residence.' "[63] This power to modify is, of course, subject to the requirement of § 1325(a)(5) that the secured creditor receive the present value of its claim as of the petition date. In *Till v. SCS Credit Corp.*,[64] the United Stated Supreme Court, considering § 1325(a)(5) and the interest to be paid on a secured claim bifurcated under § 506, held that the Section required payment of interest on the secured claim at a current rate determined by an adjustment from the prime rate based upon the risk of nonpayment.[65] The Supreme Court expressly rejected requiring the Chapter 13 plan to propose payment of the secured claim at the contract rate of interest.

In other cases concerning § 1325(a)(*), creditors have made the argument that with the enactment of BAPCPA and

---

**61.** H.R. Rep. No. 109–31(I) at 17 (2005), U.S.Code Cong. & Admin.News 2005, pp. 88, 103 (emphasis added). Note that "S. 256" found in the portion of the House Report cited, refers to BAPCPA, which was introduced as Senate Bill 256.

**62.** H.R.Rep. No. 109–31(I) at 554 (2005), *as reprinted in* E–2 Collier on Bankruptcy at App. Pt. 10–903 (Lawrence P. King et al. eds., 15th

ed. revised 2005) (emphasis added). *See Turner*, 349 B.R. at 441–42.

**63.** *Till*, 541 U.S. at 475, 124 S.Ct. 1951.

**64.** *Id.*

**65.** *Id.* at 478–79, 124 S.Ct. 1951. *See In re Fleming*, 339 B.R. 716, 721 (Bankr.E.D.Mo. 2006).

§ 1325(a)(*), *Till* has been abrogated.[66] There is simply no basis for this contention. No provision of BAPCPA prohibits the modification of secured creditors' rights under § 1322(b)(2).[67] Had Congress intended to create an absolute safe-harbor for secured creditors holding claims qualifying under § 1325(a)(*), like it provided for home mortgages under § 1322(b)(2), Congress could have done so, but it did not.[68] Section § 1325(a)(*) neither addresses the issue of interest nor prohibits the modification of claims qualifying under that section.[69] Section 1325(a)(*) only says that § 506 is not available to bifurcate secured claims qualifying under that section. BAPCPA did not amend § 1322(b)(2) with its grant of leeway to amend; therefore, the right to do so still exists. Further, there is no mention of interest or of *Till* in any of the legislative history of the amendments to § 1325.[70] Clearly, therefore, *Till*, with its mandate regarding the payment of post-petition interest, is not abrogated. Secured claims qualifying under § 1325(a)(*) shall be paid at the interest rate set forth

in *Till* so as to satisfy the present value requirement of § 1325(a)(5).[71]

## CONCLUSION

It is, therefore, the holding of this Court that the security interest of Nuvell is in fact a purchase money security interest qualifying for treatment under § 1325(a)(*). The Court further holds that § 1325(a)(*) serves only to prevent the bifurcation of a secured claim under § 506 and does not disqualify a claim from the status of an "allowed secured claim" for purposes of applying § 1325(a)(5) and its present value requirement. Lastly, the Court holds that the Supreme Court decision of *Till v. SCS Credit Corp.* was not abrogated by BAPCPA and that the interest requirement it mandates is applicable to claims qualifying under § 1325(a)(*).

---

66. *See In re Robinson*, 338 B.R. 70, 74 (Bankr.W.D.Mo.2006); *In re Wright*, 338 B.R. 917, 919 (Bankr.M.D.Ala.2006); *Fleming*, 339 B.R. at 722–23; *In re Shaw*, 341 B.R. 543 (Bankr.E.D.N.C.2006); *In re Pryor*, 341 B.R. 648 (Bankr.C.D.Ill. May 12, 2006).

67. *See Brown*, 339 B.R. at 822.

68. *See Wright*, 338 B.R. at 920.

69. *See Robinson*, 338 B.R. at 75; *Johnson*, 337 B.R. at 273.

70. *Robinson*, 338 B.R. at 75.

71. It should be noted that the vast majority of cases considering the interest rate issue have held, as this Court does, that a creditor whose claim qualifies under § 1325(a)(*) is entitled to receive post-petition interest at a current rate determined by the prime rate adjusted for risk as set forth in *Till. See Johnson*, 337 B.R. at 273; *Robinson*, 338 B.R. at 74–75; *Wright*, 338 B.R. at 919–20; *Brown*, 339 B.R. at 822; *Fleming*, 339 B.R. at 724; *Shaw*, 341 B.R. at 547; *Pryor*, 341 B.R. at 651–52.